## BRISCOE ET AL. *v.* LaHUE ET AL.

No. 81–1404.   Argued November 9, 1982—Decided March 7, 1983

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, *post*, p. 346. MARSHALL, J., filed a dissenting opinion, in which BLACKMUN, J., joined except as to Part I, *post*, p. 346. BLACKMUN, J., filed a dissenting opinion, *post*, p. 369.

*Edmund B. Moran, Jr.*, argued the cause for petitioners. With him on the briefs was *Robert A. Creamer.*

*Harriet Lipkin* argued the cause for respondents. With her on the brief was *William T. Enslen.*

JUSTICE STEVENS delivered the opinion of the Court.

This case presents a question of statutory construction: whether 42 U. S. C. § 1983 (1976 ed., Supp. V) authorizes a convicted person to assert a claim for damages against a police officer for giving perjured testimony at his criminal trial. The Court of Appeals for the Seventh Circuit held that witnesses are absolutely immune from damages liability based on their testimony, and rejected the petitioners' contention that government officials who testify about the performance of their official duties may be held liable under § 1983 even if other witnesses may not. We agree with that conclusion.

The Court of Appeals heard argument in three separate cases raising the absolute immunity issue and decided them in a single opinion. Two of these cases are before us on a writ of certiorari. Petitioner Briscoe was convicted in state court of burglarizing a house trailer. He then filed a § 1983 complaint against respondent LaHue, a member of the Bloomington, Indiana, police force, alleging that LaHue had violated his constitutional right to due process by committing perjury in the criminal proceedings leading to his conviction.[1]

---

[1] The Court has held that the prosecutor's knowing use of perjured testimony violates due process, but has not held that the false testimony of a police officer in itself violates constitutional rights. See *United States* v. *Agurs*, 427 U. S. 97, 103, and nn. 8, 9 (1976) (citing cases).

LaHue had testified that in his opinion Briscoe was one of no more than 50 to 100 people in Bloomington whose prints would match a partial thumbprint on a piece of glass found at the scene of the crime. According to Briscoe, the testimony was false because the Federal Bureau of Investigation and the state police considered the partial print too incomplete to be of value, and without the print there was no evidence identifying him as the burglar. He sought $100,000 in damages. The District Court granted LaHue's motion for summary judgment on four separate grounds: (1) the facts alleged in the complaint did not suggest that LaHue had testified falsely; (2) allegations of perjury alone are insufficient to state a constitutional claim; (3) LaHue had not testified "under color of law"; and (4) Briscoe's claim was collaterally estopped by his criminal conviction.

Petitioners Vickers and Ballard were jointly tried and convicted of sexual assault in state court. They subsequently brought a civil action under § 1983 against respondent Hunley, a member of the Cedar Lake, Indiana, police force, alleging that he had deprived them of their constitutional rights to due process and a fair trial. They alleged that, by giving false testimony suggesting that they had been able to harmonize their stories before making exculpatory statements to police, he had prejudicially diminished the credibility of those statements. Each plaintiff sought $150,000 in compensatory and $50,000 in punitive damages. The Federal Magistrate granted a motion to dismiss the complaint on alternative grounds: (1) Hunley had not testified "under color of law"; (2) he was entitled to absolute witness immunity; and (3) petitioners had failed to state a claim under § 1983 because they did not allege that the prosecutor had knowingly used false testimony. The District Court affirmed the dismissal on the first ground. Both cases were appealed to the United States Court of Appeals for the Seventh Circuit.[2]

_____

[2] At the time of the Court of Appeals' decision, petitioner Briscoe's conviction had been set aside by the Indiana Court of Appeals on the ground that the evidence was insufficient to prove Briscoe's guilt beyond a reason-

Although other issues were argued in the Court of Appeals, its holding in both cases was predicated squarely on the ground that, in litigation brought under 42 U. S. C. § 1983 (1976 ed., Supp. V), all witnesses—police officers as well as lay witnesses—are absolutely immune from civil liability based on their testimony in judicial proceedings. 663 F. 2d 713 (1981).[3] Because of the importance of the immunity question, which has given rise to divergent conclusions in the Courts of Appeals,[4] we granted certiorari. 455 U. S. 1016 (1982).[5]

---

able doubt. The opinion did not question the veracity of LaHue's testimony, but found that the State's evidence, including testimony that Briscoe was one of 50 to 100 persons who might have robbed the trailer, did not meet the State's burden of proof. *Briscoe* v. *State*, 180 Ind. App. 450, 460, 388 N. E. 2d 638, 644 (1979). Petitioners Vickers and Ballard were still serving their sentences when the Court of Appeals affirmed the dismissal of their complaint.

[3] On review of pretrial orders dismissing petitioners' complaints, the Court of Appeals assumed that the complaints' factual allegations of perjury were true. It also assumed that petitioners had alleged a constitutional violation—that they had been deprived of their liberty without due process of law by respondents' perjury in the judicial proceedings that resulted in their convictions. Because we granted certiorari to review the Court of Appeals' holding, we make the same assumptions for purposes of deciding this case, without implying that they are valid. In light of its resolution of the immunity question the Court of Appeals did not determine whether the respondents had acted "under color of law," though it suggested that it might have answered in the affirmative. 663 F. 2d, at 721, n. 4.

[4] A rule of absolute witness immunity has been adopted by the majority of Courts of Appeals. *Brawer* v. *Horowitz*, 535 F. 2d 830, 836–837 (CA3 1976) (lay witness in federal court; *Bivens* action); *Burke* v. *Miller*, 580 F. 2d 108 (CA4 1978) (state medical examiner; § 1983 action), cert. denied, 440 U. S. 930 (1979); *Charles* v. *Wade*, 665 F. 2d 661 (CA5 1982) (police officer victim; § 1983 suit), cert. pending, No. 81–1881; *Myers* v. *Bull*, 599 F. 2d 863, 866 (CA8) (police officer witness; § 1983 suit), cert. denied, 444 U. S. 901 (1979); *Blevins* v. *Ford*, 572 F. 2d 1336 (CA9 1978) (private witnesses and former Assistant U. S. Attorney; action under § 1983 and the Fifth Amendment). But see *Briggs* v. *Goodwin*, 186 U. S. App. D. C. 179, 569 F. 2d 10 (1977) (dicta rejecting absolute immunity for government

Before confronting the precise question that this case presents—whether § 1983 creates a damages remedy against police officers for their testimony as witnesses—we begin by considering the potential liability of lay witnesses on the one hand, and of judges and prosecutors who perform integral functions in judicial proceedings on the other hand. The unavailability of a damages remedy against both of these categories sheds considerable light on petitioners' claim that Congress intended police officer witnesses to be treated differently.

## I

There are two reasons why § 1983 does not allow recovery of damages against a private party for testimony in a judicial proceeding. First, § 1983 does not create a remedy for all conduct that may result in violation of "rights, privileges, or immunities secured by the Constitution and laws." Its reach is limited to actions taken "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . ."[6] It is beyond question that, when a private

---

official witness; *Bivens* action), cert. denied, 437 U. S. 904 (1978); *Hilliard* v. *Williams*, 516 F. 2d 1344, 1350 (CA6 1975) (rejecting absolute immunity for agent of state bureau of investigation; § 1983 action), cert. denied *sub nom. Clark* v. *Hilliard*, 423 U. S. 1066 (1976).

[5] The petition for writ of certiorari presents the following question: "Whether a police officer who commits perjury during a state court criminal trial should be granted absolute immunity from civil liability under 42 U. S. C. § 1983." Pet. for Cert. i. The petition does not raise the question of immunity for testimony at pretrial proceedings such as probable-cause hearings, nor does petitioners' brief discuss whether the same immunity considerations that apply to trial testimony also apply to testimony at probable-cause hearings. We therefore do not decide whether respondent LaHue is entitled to absolute immunity for allegedly false testimony at two probable-cause hearings regarding petitioner Briscoe.

[6] Thus, even though the defective performance of defense counsel may cause the trial process to deprive an accused person of his liberty in an unconstitutional manner, *Cuyler* v. *Sullivan*, 446 U. S. 335, 342–345 (1980), the lawyer who may be responsible for the unconstitutional state action

party gives testimony in open court in a criminal trial, that act is not performed "under color of law."[7]

Second, since 1951, when this Court decided *Tenney* v. *Brandhove*, 341 U. S. 367, it has been settled that the all-encompassing language of § 1983, referring to "[e]very person" who, under color of law, deprives another of federal constitutional or statutory rights, is not to be taken literally.[8]

"It is by now well settled that the tort liability created by § 1983 cannot be understood in a historical vacuum. . . . One important assumption underlying the Court's decisions in this area is that members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary." *City of Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 258 (1981).

See *Pierson* v. *Ray*, 386 U. S. 547, 554 (1967).

The immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings[9]

---

does not himself act under color of state law within the meaning of § 1983. *Polk County* v. *Dodson*, 454 U. S. 312 (1981). This conclusion is compelled by the character of the office performed by defense counsel. See *id.*, at 317–319; *Ferri* v. *Ackerman*, 444 U. S. 193, 204 (1979). It is equally clear that the office of the lay witness who merely discharges his duty to testify truthfully is not performed under color of law within the meaning of § 1983.

[7] It is conceivable, however, that nongovernmental witnesses could act "under color of law" by conspiring with the prosecutor or other state officials. See *Dennis* v. *Sparks*, 449 U. S. 24, 27–29 (1980); *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 152 (1970). It is therefore necessary to go beyond the "color of law" analysis to consider whether private witnesses may ever be held liable for damages under § 1983.

[8] Nor is this the only piece of 19th-century legislation in which the word "every" may not be given a literal reading. See *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 687–688 (1978).

[9] The availability of a common-law action for false accusations of crime, see *post*, at 350–351, is inapposite because petitioners present only the

was well established in English common law. *Cutler* v. *Dixon*, 4 Co. Rep. 14b, 76 Eng. Rep. 886 (Q. B. 1585); *Anfield* v. *Feverhill*, 2 Bulst. 269, 80 Eng. Rep. 1113 (K. B. 1614); *Henderson* v. *Broomhead*, 4 H. & N. 569, 578, 157 Eng. Rep. 964, 968 (Ex. 1859);[10] see *Dawkins* v. *Lord Rokeby*, 4 F. & F. 806, 833–834, 176 Eng. Rep. 800, 812 (C. P. 1866). Some American decisions required a showing that the witness' allegedly defamatory statements were relevant to the judicial proceeding, but once this threshold showing had been made, the witness had an absolute privilege.[11] The

question of § 1983 liability for false testimony during a state-court criminal trial. See n. 5, *supra*.

[10] "We have therefore a large collection of cases where from time to time parties have attempted to get damages in cases like the present, but in no one instance has the action ever been held to be maintainable. If for centuries many persons have attempted to get a remedy for injuries like the present, and there is an entire absence of authority that such remedy exists, it shews the unanimous opinion of those who have held the place which we do now, that such an action is not maintainable." *Henderson* v. *Broomhead*, 4 H. & N., at 578, 157 Eng. Rep., at 968.

[11] See generally M. Newell, Law of Defamation, Libel and Slander 425, 450–459 (1890); J. Townshend, A Treatise on the Wrongs Called Slander and Libel 353–354 (2d ed. 1872). See, *e. g.*, *Lawson* v. *Hicks*, 38 Ala. 279, 285–288 (1862); *Myers* v. *Hodges*, 53 Fla. 197, 208–210, 44 So. 357, 361 (1907); *Smith* v. *Howard*, 28 Iowa 51, 56–57 (1869); *Gardemal* v. *McWilliams*, 43 La. Ann. 454, 457–458, 9 So. 106, 108 (1891); *Burke* v. *Ryan*, 36 La. Ann. 951, 951–952 (1884); *McLaughlin* v. *Cowley*, 127 Mass. 316, 319–320 (1879); *Barnes* v. *McCrate*, 32 Me. 442, 446–447 (1851); *Cooper* v. *Phipps*, 24 Ore. 357, 363–364, 33 P. 985, 986–987 (1893); *Shadden* v. *McElwee*, 86 Tenn. 146, 149–154, 5 S. W. 602, 603–605 (1887); *Cooley* v. *Galyon*, 109 Tenn. 1, 13–14, 70 S. W. 607, 610 (1902); cf. *Hoar* v. *Wood*, 44 Mass. 193, 197–198 (1841) (statements by counsel); *Marsh* v. *Ellsworth*, 50 N. Y. 309, 312–313 (1872) (same). Other courts appear to have taken a position closer to the English rule, which did not require any showing of pertinency or materiality. See, *e. g.*, *Chambliss* v. *Blau*, 127 Ala. 86, 89–90, 28 So. 602, 603 (1899); cf. *Calkins* v. *Sumner*, 13 Wis. 193, 197–198 (1860) (in absence of objection and ruling by court, lack of pertinency of responses to questions does not remove immunity, because witnesses are not in a position to know what statements are pertinent to the case).

Although some cases used the words "good faith," see, *e. g.*, *White* v. *Carroll*, 42 N. Y. 161, 166 (1870); *Shadden* v. *McElwee, supra*, at 149–150,

plaintiff could not recover even if the witness knew the statements were false and made them with malice.[12]

In the words of one 19th-century court, in damages suits against witnesses, "the claims of the individual must yield to

---

5 S. W., at 603, good faith was established as a matter of law if the statements were pertinent and material to the judicial proceeding and given in response to questions. Indeed, even if the testimony was not pertinent, the plaintiff had the burden of proving bad faith. The testimony by respondents in this case would have received absolute protection at common law, because it was directly relevant to the criminal charges against petitioners. If the testimony had not been relevant, it is unlikely that petitioners would have stated a claim that their constitutional rights had been violated. Therefore, for purposes of § 1983 analysis, there is no material difference between the English rule and the American rule.

[12] JUSTICE MARSHALL's dissent relies heavily on an opinion rendered by this Court, *White* v. *Nicholls*, 3 How. 266, 286–288 (1845). The Court's discussion of privileged statements in judicial proceedings was purely dictum. The plaintiff sought damages for defendants' allegedly defamatory assertions in a petition to the President of the United States requesting the plaintiff's removal from office as a customs collector, a statement entitled at most to a qualified privilege. *White* v. *Nicholls* cannot be considered authoritative. In 1909 a leading commentator stated:

"[T]he demands of public policy on which the rule [of absolute immunity] is based are so controlling that there is only one considered case in the English or American reports in which the existence of the general doctrine of absolute immunity under the common law has ever been questioned. Strangely enough this isolated instance was a decision of the Supreme Court of the United States, in the course of which Mr. Justice Daniel, speaking for the court, denied both the rule and its policy; but this expression of opinion was *obiter*, since the case in issue was one of qualified immunity." Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum. L. Rev. 463, 465–466 (footnotes omitted).

In 1860, a New York court asserted that "the reasoning of Judge Daniel's opinion, and the propositions which he deduces where he goes beyond the case in hand, are clearly unsustained by principle or authority." *Perkins* v. *Mitchell*, 31 Barb. 461, 468 (N. Y. Sup. Ct.). In 1878, the West Virginia Supreme Court severely criticized *White* v. *Nicholls*, stating: "We have reviewed all the authorities, cited by Justice Daniel, and have seen, that none of them are in conflict with the position, that express malice may be shielded by its being expressed in judicial proceedings in certain forms. . . . And the review of the American authorities will show, that the overwhelming weight of authority is opposed to Justice Daniel's idea, that

the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." *Calkins* v. *Sumner*, 13 Wis. 193, 197 (1860). A witness' apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. See *Henderson* v. *Broomhead, supra,* at 578–579, 157 Eng. Rep., at 968. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability. See *Barnes* v. *McCrate,* 32 Me. 442, 446–447 (1851). Even within the constraints of the witness' oath there may be various ways to give an account or to state an opinion. These alternatives may be more or less detailed and may differ in emphasis and certainty. A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence. See Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum. L. Rev. 463, 470 (1909).[18] But the truthfinding process is better

---

there is no case, in which an action of slander or libel will not lie for libelous matter, spoken or written in the course of regular judicial proceedings. . . . The authorities, both English and American, fully establish the position, that there is a class of absolutely privileged communications . . . ." *Johnson* v. *Brown,* 13 W. Va. 71, 128–129. See also *McGehee* v. *Insurance Co. of North America,* 112 F. 853 (CA5 1902) (declining to follow *White* v. *Nicholls*); *Shelfer* v. *Gooding,* 47 N. C. 175, 181–182 (1855) (suggesting that Justice Daniel miscited *Hodgson* v. *Scarlett,* 1 Barn. & Ald. 232, 106 Eng. Rep. 86 (K. B. 1818)). In short, *White* v. *Nicholls* was not even a reliable statement of the common law; still less was it "the most salient feature in the landscape of the common law at the time Congress acted" in 1871.

[18] In addition, some courts expressed concern that, in the absence of a privilege, honest witnesses might erroneously be subjected to liability because they would have difficulty proving the truth of their statements. This result seemed inappropriate in light of the witness' duty to testify. *E. g., Calkins* v. *Sumner,* 13 Wis., at 198; *Barnes* v. *McCrate,* 32 Me., at 446–447; *Chambliss* v. *Blau,* 127 Ala., at 89, 28 So., at 603.

served if the witness' testimony is submitted to "the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies." *Imbler* v. *Pachtman*, 424 U. S. 409, 440 (1976) (WHITE, J., concurring in judgment).[14]

At least with respect to private witnesses, it is clear that § 1983 did not abrogate the absolute immunity existing at common law, and petitioners do not contend otherwise. Like the immunity for legislators at issue in *Tenney* v. *Brandhove*, the common law's protection for witnesses is "a tradition so well grounded in history and reason" that we cannot believe that Congress impinged on it "by covert inclusion in the general language before us." 341 U. S., at 376.

## II

The Court has already addressed the question whether § 1983 permits damages recoveries from judges, prosecutors, and other persons acting "under color of law" who perform official functions in the judicial process. Again, we have found that, in light of common-law immunity principles, § 1983 did not impose liability on these officials. We have held that state judges are absolutely immune from liability for their judicial acts, *Pierson* v. *Ray*, 386 U. S. 547 (1967); *Stump* v. *Sparkman*, 435 U. S. 349 (1978), and that state prosecutors have absolute immunity from liability for their actions in initiating prosecutions, *Imbler* v. *Pachtman*, *supra*.

The central focus of our analysis has been the nature of the judicial proceeding itself. Thus, in his opinion concurring in the judgment in *Imbler* v. *Pachtman*, *supra*, JUSTICE WHITE explained that the absolute immunity of public prosecutors was "based on the policy of protecting the judicial process."

---

[14] Cf. *Marsh* v. *Ellsworth*, 50 N. Y., at 312 (importance of placing all relevant evidence before court and jury "to enable them to arrive at the truth"); *Hoar* v. *Wood*, 44 Mass., at 197 (stressing impartiality of judge as sufficient antidote to inaccuracies and exaggerations by adversaries).

424 U. S., at 439. He explained that this protection extended equally to other participants, including counsel and witnesses.

> "The reasons for this rule are also substantial. It is precisely the function of a judicial proceeding to determine where the truth lies. The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal (and civil) cases are such that those involved in judicial proceedings should be 'given every encouragement to make a full disclosure of all pertinent information within their knowledge.'" *Ibid.*

The common law's protection for judges and prosecutors formed part of a "cluster of immunities protecting the various participants in judge-supervised trials," which stemmed "from the characteristics of the judicial process." *Butz* v. *Economou,* 438 U. S. 478, 512 (1978); cf. *King* v. *Skinner,* Lofft 54, 56, 98 Eng. Rep. 529 (K. B. 1772) ("[N]either party, witness, counsel, jury, or judge can be put to answer, civilly or criminally, for words spoken in office"). The common law recognized that

> "controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another . . . . Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation." *Butz,* *supra,* at 512.

In short, the common law provided absolute immunity from subsequent damages liability for all persons—governmental or otherwise—who were integral parts of the judicial process. It is equally clear that § 1983 does not authorize a damages claim against private witnesses on the one hand, or against judges or prosecutors in the performance of their respective duties on the other. When a police officer appears as a witness, he may reasonably be viewed as acting like any

other witness sworn to tell the truth—in which event he can make a strong claim to witness immunity; [15] alternatively, he may be regarded as an official performing a critical role in the judicial process, in which event he may seek the benefit afforded to other governmental participants in the same proceeding. Nothing in the language of the statute suggests that such a witness belongs in a narrow, special category lacking protection against damages suits. We must ask, however, whether anything in the legislative history of § 1983 points to a different conclusion.

## III

Petitioners point to a number of references throughout the debates on the 1871 Act to widespread perjury by Ku Klux Klan witnesses in state criminal trials. [16] They urge that, because perjury was one of the specific evils with which Congress was concerned, recognizing an absolute immunity for witnesses would conflict with congressional intent. We find this argument unpersuasive. The Act consisted of several sections establishing different remedies for disorder and violence in the Southern States. [17] The legislative history and statutory language indicate that Congress intended perjury

---

[15] The common-law immunity that protected witnesses as well as other participants in the judicial process drew no distinction between public officials and private citizens. See Veeder, *supra* n. 12, at 468–469. The general purposes underlying witness immunity at common law applied equally to official and private witnesses. Both types of witness took the stand and testified under oath in response to the questions of counsel. Both might be deterred by the prospect of subsequent, vexatious litigation.

[16] Brief for Petitioners 19–20, citing 1 B. Schwartz, Statutory History of the United States: Civil Rights 599–606, 625 (1970).

[17] In addition to § 1, codified as § 1983, and § 2, discussed in text *infra*, the Act permitted the President to use armed force in response to insurrection and domestic violence (§ 3), authorized the suspension of habeas corpus if the President deemed it necessary (§ 4), required grand and petit jurors to take a test oath (§ 5), and provided a civil penalty against persons who knew of and failed to prevent § 2 violations. 17 Stat. 13.

leading to unjust acquittals of Klan conspirators to be prohibited by § 2, the civil and criminal conspiracy section of the statute, now codified in relevant part at 42 U. S. C. § 1985(3) (1976 ed., Supp. V) and 18 U. S. C. § 241. But the language of § 1—now codified as § 1983—differs from that of § 2 in essential respects, and we find no evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions.

The Ku Klux Act, 17 Stat. 13, was enacted on April 20, 1871, less than a month after President Grant sent a dramatic message to Congress describing the breakdown of law and order in the Southern States. Cong. Globe, 42d Cong., 1st Sess., 236, 244 (1871). During the debates, supporters of the bill repeatedly described the reign of terror imposed by the Klan upon black citizens and their white sympathizers in the Southern States. Hours of oratory were devoted to the details of Klan outrages—arson, robbery, whippings, shootings, murders, and other forms of violence and intimidation—often committed in disguise and under cover of night. These acts of lawlessness went unpunished, legislators asserted, because Klan members and sympathizers controlled or influenced the administration of state criminal justice. In particular, it was alleged that Klan members were obligated, by virtue of membership in the organization, to protect fellow members who were charged with criminal activity. They had a duty to offer themselves for service on grand and petit juries, and to violate their jurors' oaths by refusing to indict or to convict regardless of the strength of the evidence. They also were bound to appear as witnesses, and again to violate their oaths by committing perjury, if necessary, to exculpate their Klan colleagues.[18] Perjury was thus one of the

---

[18] Supporters of the bill repeatedly quoted the testimony before an investigating committee of two former Klan members, who described a Klan oath binding its members to commit perjury. Cong. Globe, 42d Cong., 1st Sess., 152, 158, 173, 201, 320–321, 322, 340, 437, 439, 443–444, 457, 458, 503, 516, 518, 653, 654, 687 (1871).

means by which the Klan prevented state courts from gaining convictions of Klan members for crimes against blacks and Republicans.

It is clear from the legislative debates that, in the view of the Act's sponsors, the victims of Klan outrages were deprived of "equal protection of the laws" if the perpetrators systematically went unpunished.[19]  Proponents of the measure repeatedly argued that, given the ineffectiveness of state law enforcement and the individual's federal right to "equal protection of the laws," an independent federal remedy was necessary and Congress had the power to provide it.[20]  See *Monroe* v. *Pape*, 365 U. S. 167, 174 (1961).

Section 2 was designed specifically to provide criminal and civil remedies in federal court for the conspiratorial activities of the Klan.  Indeed the provision singles out those who "go in disguise upon the public highway."  Earlier versions of the section enumerated precisely the activities that had been attributed to the Klan—murder, manslaughter, mayhem, robbery, assault and battery, perjury, subornation of perjury, criminal obstruction of legal process or resistance of of-

---

[19] See *id.*, at 322 (remarks of Rep. Stoughton); 334 (remarks of Rep. Hoar); 375 (remarks of Rep. Lowe); 428 (remarks of Rep. Beatty); 458, 459 (remarks of Rep. Coburn); 481–482 (remarks of Rep. Wilson); 486 (remarks of Rep. Cook); 501 (remarks of Sen. Frelinghuysen); 506 (remarks of Sen. Pratt); 608 (remarks of Sen. Pool); 697 (remarks of Sen. Edmunds).

[20] As Representative Coburn stated:

"The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can; their sympathies are not so nearly identified with those of the vicinage; the jurors are taken from the State, and not the neighborhood; they will be able to rise above prejudices and bad passions or terror more easily.  The marshal, clothed with more power than the sheriff, can make arrests with certainty, and, with the aid of the General Government, can seize offenders in spite of any banded and combined resistance such as may be expected." *Id.*, at 460.

See *id.*, at 334 (remarks of Rep. Hoar); 374 (remarks of Rep. Lowe); 428 (remarks of Rep. Beatty); 459–460 (remarks of Rep. Coburn); 486 (remarks of Rep. Cook); 501 (remarks of Sen. Frelinghuysen); 514 (remarks of Rep. Poland).

ficers in discharge of official duty, arson, or larceny. Cong. Globe, *supra*, at 317. The more general language in the final version of § 2 was also intended to apply to the abuses that had been described repeatedly in congressional debate.[21] Part of the provision is particularly well tailored to reach conspiracies to commit perjury in order to prevent punishment of fellow Klansmen. It provides penalties whenever two or more persons shall

> "conspire together . . . for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws, or shall conspire together for the purpose of in any manner impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws . . . ."[22]

This evidence does not, however, tend to show that Congress intended to abrogate witness immunity in civil actions under § 1, which applied to wrongs committed "under color of . . . law." The bill's proponents were exclusively concerned with perjury resulting in unjust *acquittals*—perjury likely to be committed by private parties acting in furtherance of a conspiracy—and not with perjury committed "under color of

---

[21] Compare *id.*, at 317 (original version introduced by Rep. Shellabarger) with *id.*, at 477–478 (more general language in amended version); see *id.*, at 567, 702 (Senate amendment adding language punishing conspiracy for obstructing the due course of justice).

[22] It is noteworthy that the imposition of criminal liability on persons for conspiracy to give false evidence was not in derogation of the common law as it existed in 1871. Witnesses were traditionally subject to a prosecution for perjury committed in the course of their evidence, "or for conspiracy in case of a combination of two or more to give false evidence." Newell, *supra* n. 11, at 450, § 44. The offense of perjury had been shaped in English law during the 16th and 17th centuries by Parliament, the Court of Star Chamber, and common-law judges. 4 W. Holdsworth, A History of English Law 515–519 (1924); S. Milsom, Historical Foundations of the Common Law 418 (2d ed. 1981).

law" that might lead to unjust *convictions*. In hundreds of pages of debate there is no reference to the type of alleged constitutional deprivation at issue in this case: perjury by a *government official* leading to an unjust conviction. Indeed, the legislative history is virtually silent even with regard to perjury by *private* persons leading to convictions of innocent defendants.[23] There is a simple enough reason for this lacuna: the Klan had other, more direct, means of dealing with its victims. A "reign of terrorism and bloodshed" did not require the formal processes of law; at most, drumhead tribunals were convened at dead of night.[24] Even when the organization's intended victims had been taken into custody and charged with crimes, the evidence before Congress suggested that the Klan resorted to vigilante justice rather than courtroom perjury.[25]

In summary, the legislative history supports criminal punishment under § 2 for a witness who conspired to give perjured testimony favorable to a defendant, with the effect of preventing effective enforcement of the laws, and liability in a civil suit against the perjured witness by the defendant's victim. But these are not the issues before us today. We are asked to extrapolate from pro-defendant perjury to pro-prosecution perjury, and if willing to make that step, we are further invited to apply legislative history relating to § 2—a section specifically directed toward private conspiracies—to § 1—a section designed to provide remedies for abuses under

---

[23] In several hundred pages of small triple-columned print, only one Senator—not a member of the Committee that reported the bill—referred to the possibility that perjury was being used to convict the innocent. See Cong. Globe, 42d Cong., 1st Sess., 653 (1871) (remarks of Sen. Osborn). His comments were made in connection with a proposal to retain a test oath for grand and petit jurors.

[24] The debates describe nocturnal Klan meetings passing decrees condemning political enemies. See *id.*, at 157, 209, 320, 321, 504.

[25] For references to lynch mobs attacking suspects held in custody, see *id.*, at 156, 157, 166, 200, 321, 444, 446, 447.

color of law. We decline the invitation. The debates of the 42d Congress do not support petitioners' contention that Congress intended to provide a § 1 damages remedy against police officers or any other witnesses.[26]

## IV

Petitioners, finally, urge that we should carve out an exception to the general rule of immunity in cases of alleged perjury by police officer witnesses.[27] They assert that the reasons supporting common-law immunity—the need to

---

[26] The legislative history of the Civil Rights Act of 1866, discussed at length by JUSTICE MARSHALL's dissent, simply does not speak to the question whether Congress intended witnesses—private parties or public officials—to be civilly liable for false testimony resulting in an unjust criminal conviction. It makes clear that judges and other "state officials integral to the judicial process" are subject to *criminal* liability for violating the constitutional rights of individuals. But we have never questioned that proposition, and we do not do so now. Moreover, witnesses enjoyed no common-law immunity from criminal prosecution for perjury. See n. 22, *supra.* Therefore the *criminal* provisions of the 1866 Act and its successors apply to official witnesses. See n. 32, *infra.* But the 1866 legislative history, to the extent that it sheds any light on the meaning of the 1871 Act, does not support *civil* liability for such witnesses, because it does not show the requisite congressional intent to override the clearly established common-law immunity of witnesses from civil liability. With respect to witnesses, the legislative history of the 1866 Act is simply silent, and we are unwilling to assume that, whenever legislators referred to "state judicial officials" or to "the judicial power of the State," they were describing witnesses as well as judges, sheriffs, and marshals.

Moreover, our decisions recognizing absolute immunity for judges and prosecutors from civil liability under the 1871 Act implicitly reject the position that the legislative history of the 1866 Act defines the scope of immunity for purposes of the 1871 Act. See *Pierson* v. *Ray,* 386 U. S. 547 (1967); *Imbler* v. *Pachtman,* 424 U. S. 409 (1976).

[27] The contours of the proposed exception are not clear. Similar considerations would presumably apply to other government officials and experts, including coroners, medical examiners, psychiatric experts, and social workers.

avoid intimidation and self-censorship—apply with diminished force to police officers. Policemen often have a duty to testify about the products of their investigations, and they have a professional interest in obtaining convictions which would assertedly counterbalance any tendency to shade testimony in favor of potentially vindictive defendants. In addition, they are subject to § 1983 lawsuits for the performance of their other duties, as to which they have only qualified immunity, and their defense is generally undertaken by their governmental employers. Further, petitioners urge that perjured testimony by police officers is likely to be more damaging to constitutional rights than such testimony by ordinary citizens, because the policeman in uniform carries special credibility in the eyes of jurors. And, in the case of police officers, who cooperate regularly with prosecutors in the enforcement of criminal law, prosecution for perjury is alleged to be so unlikely that it is not an effective substitute for civil damages.

These contentions have some force. But our cases clearly indicate that immunity analysis rests on functional categories, not on the status of the defendant.[28] A police officer on the witness stand performs the same functions as any other witness; he is subject to compulsory process, takes an oath, responds to questions on direct examination and cross-examination, and may be prosecuted subsequently for perjury.

Moreover, to the extent that traditional reasons for witness immunity are less applicable to governmental witnesses,

---

[28] See *Butz* v. *Economou*, 438 U. S. 478, 513–514 (1978) (administrative law judges enjoy absolute judicial immunity even though they are in the Executive Branch); *Imbler* v. *Pachtman, supra*, at 430–431 (reserving the question whether a prosecutor, who is absolutely immune for decisions to initiate a prosecution or put witnesses on the stand, has similar immunity for administrative or investigative tasks); cf. *Hampton* v. *City of Chicago*, 484 F. 2d 602, 608 (CA7 1973) (prosecutor's immunity ceases when he acts in a capacity other than his quasi-judicial role), cert. denied, 415 U. S. 917 (1974).

other considerations of public policy support absolute immunity more emphatically for such persons than for ordinary witnesses. Subjecting government officials, such as police officers, to damages liability under § 1983 for their testimony might undermine not only their contribution to the judicial process but also the effective performance of their other public duties.

Section 1983 lawsuits against police officer witnesses, like lawsuits against prosecutors, "could be expected with some frequency." Cf. *Imbler* v. *Pachtman*, 424 U. S., at 425. Police officers testify in scores of cases every year, and defendants often will transform resentment at being convicted into allegations of perjury by the State's official witnesses. As the files in this case show, even the processing of a complaint that is dismissed before trial consumes a considerable amount of time and resources.[29]

This category of § 1983 litigation might well impose significant burdens on the judicial system and on law enforcement resources. As this Court noted when it recognized absolute immunity for prosecutors in *Imbler*, if the defendant official "could be made to answer in court each time [a disgruntled defendant] charged him with wrongdoing, his energy and at-

---

[29] Moreover, lawsuits alleging perjury on the stand in violation of the defendant's due process rights often raise material questions of fact, inappropriate for disposition at the summary judgment stage. The plaintiff's complaint puts in issue the falsity and materiality of the allegedly perjured statements, and the defendant witness' knowledge and state of mind at the time he testified. Sometimes collateral-estoppel principles will permit dismissal at the pretrial stage. But if the truth of the allegedly perjured statement was not necessarily decided in the previous criminal verdict, if there is newly discovered evidence of falsity, or if the defendant concedes that the testimony was inaccurate, the central issue will be the defendant's state of mind. Summary judgment is usually not feasible under these circumstances. C. Wright, Law of Federal Courts 493 (3d ed. 1976). If summary judgment is denied, the case must proceed to trial and must traverse much of the same ground as the original criminal trial.

tention would be diverted from the pressing duty of enforcing the criminal law." 424 U. S., at 425. To some degree the individual's burden might be alleviated by the government's provision of counsel, but a case that goes to trial always imposes significant emotional and other costs on every party litigant.

It is not sufficient to assert that the burdens on defendants and the courts could be alleviated by limiting the cause of action to those former criminal defendants who have already vindicated themselves in another forum, either on appeal or by collateral attack. We rejected a similar contention in *Imbler*. Petitioner contended that "his suit should be allowed, even if others would not be, because the District Court's issuance of the writ of habeas corpus shows that his suit has substance." *Id.*, at 428, n. 27. We declined to carve out such an exception to prosecutorial immunity, noting that petitioner's success in a collateral proceeding did not necessarily establish the merits of his civil rights action. Moreover, we noted that "using the habeas proceeding as a 'door-opener' for a subsequent civil rights action would create the risk of injecting extraneous concerns into that proceeding." *Ibid.* We emphasized that, in determining whether to grant postconviction relief, the tribunal should focus solely on whether there was a fair trial under law. "This focus should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment." *Id.*, at 427. The same danger exists in the case of potential liability for police officer witnesses.[30]

---

[30] We are not writing on a clean slate, and it is not for us to craft a new rule designed to enable trial judges to dismiss meritless claims before trial but to allow recovery in cases of demonstrated injustice, when an innocent plaintiff has already obtained postconviction relief. The States remain free to grant relief in such cases and, of course, Congress has the power to fashion an appropriate remedy if it perceives the need for one.

There is, of course, the possibility that, despite the truth-finding safeguards of the judicial process, some defendants might indeed be unjustly convicted on the basis of knowingly false testimony by police officers.[31]   The absolute immunity for prosecutors recognized in *Imbler* bars one possible avenue of redress for such defendants.   Similarly, in this case, the absolute witness immunity bars another possible path to recovery for these defendants.   But we have recognized, again and again, that in some situations, the alternative of limiting the official's immunity would disserve the broader public interest.   As Judge Learned Hand wrote years ago:

> "As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative.   In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."  *Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (CA2 1949), cert. denied, 339 U. S. 949 (1950).[32]

In short, the rationale of our prior absolute immunity cases governs the disposition of this case.   In 1871, common-law immunity for witnesses was well settled.   The principles set forth in *Pierson* v. *Ray* to protect judges and in *Imbler* v. *Pachtman* to protect prosecutors also apply to witnesses, who perform a somewhat different function in the trial process but whose participation in bringing the litigation to a

---

[31] There is no reason to believe, however, that this risk is any greater than, or indeed as great as, the risk of an unjust conviction resulting from a misidentification or other unintentional mistake.   There is no federal damages remedy for such innocent persons, or for those who are acquitted after undergoing the burdens of a criminal trial.

[32] Finally, in those cases in which the judicial process fails, the public is not powerless to punish misconduct.   Like prosecutors and judges, official witnesses may be punished criminally for willful deprivations of constitutional rights under 18 U. S. C. § 242.

just—or possibly unjust—conclusion is equally indispensable. The decision of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE BRENNAN, dissenting.

JUSTICE MARSHALL's dissenting opinion, *post*, presents an eloquent argument that Congress, in enacting § 1983, did not intend to create any absolute immunity from civil liability for "government officials involved in the judicial process . . . ." *Post*, at this page and 347. Whatever the correctness of his ' historical argument, I fear that the Court has already crossed that bridge in *Pierson* v. *Ray*, 386 U. S. 547 (1967), and *Imbler* v. *Pachtman*, 424 U. S. 409 (1976).

I entirely agree with JUSTICE MARSHALL, however, that the policies of § 1983 and of common-law witness immunity, as they apply to witnesses who are police officers, do not justify any absolute immunity for perjurious testimony. I therefore dissent for the reasons stated in Part IV of JUSTICE MARSHALL's opinion.

JUSTICE MARSHALL, with whom JUSTICE BLACKMUN joins, except as to Part I, dissenting.

I cannot agree that police officers are absolutely immune from civil liability under 42 U. S. C. § 1983 (1976 ed., Supp. V) for testimony given in criminal proceedings. The extension of absolute immunity conflicts fundamentally with the language and purpose of the statute. I would therefore be reluctant in any case to conclude that § 1983 incorporates common-law tort immunities that may have existed when Congress enacted the statute in 1871. But in this case the conclusion is especially unjustified. First, absolute immunity for witnesses was by no means a settled legal proposition in 1871. Most notably, in 1845 this Court had cast serious doubt on the existence of absolute immunity for testimony given in judicial proceedings. Second, the origins and history of § 1983 strongly suggest that Congress meant to abrogate any absolute immunity for government officials involved

in the judicial process, including police officers. Finally, considerations of public policy deemed necessary to justify absolute immunity in our past cases do not support an absolute immunity for officer-witnesses.

I

The majority opinion correctly states that this case presents a question of statutory construction. *Ante,* at 326. Yet it departs from generally accepted principles for interpreting laws.

In all other matters of statutory construction, this Court begins by focusing on the language of the statute itself.[1] "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 108 (1980). The language of § 1983 provides unambiguous guidance in this case. A witness is most assuredly a "person," the word Congress employed to describe those whose conduct § 1983 encompasses.[2] The ma-

---

[1] *E. g., Jackson Transit Authority* v. *Transit Union,* 457 U. S. 15, 23 (1982); *Bread Political Action Comm.* v. *FEC,* 455 U. S. 577, 580 (1982); *Universities Research Assn.* v. *Coutu,* 450 U. S. 754, 771 (1981); *Dawson Chemical Co.* v. *Rohm & Haas Co.,* 448 U. S. 176, 187 (1980).

[2] The majority criticizes a literal reading of the statute and refers to *National Society of Professional Engineers* v. *United States,* 435 U. S. 679 (1978). *Ante,* at 330, and n. 8. In *National Society,* the Court noted that the language of § 1 of the Sherman Act "cannot mean what it says." 435 U. S., at 687. But there is no logical reason why the word "person" in § 1983 should be read to exclude a witness. Moreover, on a number of occasions, this Court has relied on the plain language of § 1983. See, *e. g., Maine* v. *Thiboutot,* 448 U. S. 1, 4 (1980) ("The question before us is whether the phrase 'and laws' as used in § 1983 means what it says, or whether it should be limited to some subset of laws. Given that Congress attached no modifiers to the phrase, the plain language of the statute undoubtedly embraces respondents' claim . . ."); *Parratt* v. *Taylor,* 451 U. S. 527, 534 (1981) (relying in part on text of § 1983 to reject limitation of statute to intentional deprivations); *Owen* v. *City of Independence,* 445 U. S. 622, 635 (1980) (relying on the "absolute and unqualified" language of § 1983 to reject a qualified immunity for municipalities); *Monell* v. *New York City*

jority turns the conventional approach to statutory interpretation on its head.  It assumes that common-law tort immunities provide an exemption from the plain language of the statute unless petitioners demonstrate that Congress meant to override the immunity.  See *ante*, at 336.  Thus, in the absence of a clearly expressed legislative intent to the contrary, the Court simply presumes that Congress did not mean what it said.

Absolute immunity for witnesses conflicts not only with the language of § 1983 but also with its purpose.  In enacting § 1983, Congress sought to create a damages action for victims of violations of federal rights; absolute immunity nullifies *"pro tanto* the very remedy it appears Congress sought to create."  *Imbler* v. *Pachtman*, 424 U. S. 409, 434 (1976) (WHITE, J., concurring in judgment).  The words of a statute should always be interpreted to carry out its purpose.[3] Moreover, Members of the 42d Congress explicitly stated that § 1983 should be read so as to further its broad remedial goals.  As the sponsor of the 1871 Act, Representative Shellabarger, declared:

> "This act is remedial, and in aid of the preservation of human liberty and human rights.  All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed.  It would be most strange and, in civilized law, monstrous were this not the rule of interpretation.  As has been again and again decided by your own Supreme Court of the United States, and everywhere else where there is wise judicial

---

*Dept. of Social Services*, 436 U. S. 658, 688–689 (1978) (relying on "plain meaning" of § 1983).  Cf. *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 420 (1968) (relying on the "plain and unambiguous terms" of 42 U. S. C. § 1982).

[3] See *Mastro Plastics Corp.* v. *NLRB*, 350 U. S. 270, 285 (1956) (quoting *United States* v. *Boisdoré's Heirs*, 8 How. 113, 122 (1849)); *SEC* v. *C. M. Joiner Leasing Corp.*, 320 U. S. 344, 350–351 (1943); H. Hart & A. Sacks, The Legal Process 1411 (Tent. ed. 1958).

interpretation, the largest latitude consistent with the words employed is uniformly given in construing such statutes and constitutional provisions as are meant to protect and defend and give remedies for their wrongs to all the people." Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871).[4]

It might be appropriate to import common-law defenses and immunities into the statute if, in enacting § 1983, Congress had merely sought to federalize state tort law. But Congress "intended to give a broad remedy for violations of *federally* protected civil rights." *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 685 (1978) (emphasis added). Different considerations surely apply when a suit is based on a federally guaranteed right—in this case, the constitutional right to due process of law—rather than the common law.[5] The Congress that enacted § 1983 had concluded that "a deprivation of a constitutional right is significantly different from and more serious than a violation of a state right and therefore deserves a different remedy even though

---

[4] See also Cong. Globe, 42d Cong., 1st Sess., App. 217 (1871) (Sen. Thurman in opposition) ("[T]here is no limitation whatsoever upon the terms that are employed [in § 1983], and they are as comprehensive as can be used"); *id.*, at 800 (Rep. Perry) ("Now, by our action on this bill we have asserted as fully as we can assert the mischief intended to be remedied"); *id.*, at 476 (Rep. Dawes) (The person who "invades, trenches upon, or impairs one iota or tittle of the least of [constitutional rights], to that extent trenches upon the Constitution and laws of the United States, and this Constitution authorizes us to bring him before the courts to answer therefor").

[5] See Note, 68 Harv. L. Rev. 1229, 1232 (1955) ("When a suit is based on deprivation of a federally guaranteed right, the need to enforce federal limitations on state action constitutes a consideration in favor of recovery which is not present in suits under state law"); P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 336 (2d ed. 1973) ("[W]here constitutional rights are at stake the courts are properly astute, in construing statutes, to avoid the conclusion that Congress intended to use the privilege of immunity . . . in order to defeat them").

the same act may constitute both a state tort and the deprivation of a constitutional right." *Monroe* v. *Pape*, 365 U. S. 167, 196 (1961) (Harlan, J., concurring). Therefore, immunities that arose in the context of tort actions against private parties provide little guidance for actions against state officials for constitutional violations. "It would indeed be the purest coincidence if the state remedies for violations of common-law rights by private citizens were fully appropriate to redress those injuries which only a state official can cause and against which the Constitution provides protection." *Id.*, at 196, n. 5.

Given the language and purpose of § 1983, I have serious doubts about any further extension of absolute immunity to state officials in actions under § 1983. At a minimum, I do not believe the Court should extend absolute immunity to state officials "in the absence of the most convincing showing that the immunity is necessary." *Imbler* v. *Pachtman*, *supra*, at 434 (WHITE, J., concurring in judgment). For the reasons elaborated below, I believe that the case for absolute witness immunity is far from convincing.

## II

The majority's decision is predicated on its conclusion that "[i]n 1871, common-law immunity for witnesses was well settled." *Ante*, at 345. I disagree with this view of the law as it stood when Congress enacted § 1983.

To begin with, some of petitioners' allegations would clearly not have been barred by doctrines of immunity at common law. The majority discusses only the immunities associated with actions for defamation at common law. *Ante*, at 330–331, n. 9. However, petitioner Briscoe did not allege solely that Officer LaHue had testified falsely at his trial, a claim resembling one for defamation. He also alleged that Officer LaHue had made knowingly false charges at two probable-cause hearings, one of which resulted in Briscoe's arrest.[6] At common law, such an allegation would have

---

[6] See Memorandum in Support of Complaint, App. 9–11.

formed the basis of an action on the case for malicious prosecution,[7] or the related action known by its Latin name, *crimen feloniae imposuit* (imputing the crime of felony).[8] Both English and American courts routinely permitted plaintiffs to bring actions alleging that the defendant had made a false and malicious accusation of a felony to a magistrate or other judicial officer.[9]    No immunity barred these suits. Indeed, an absolute immunity would have been illogical, for it would have allowed a defendant to avoid the related common-law action for false imprisonment by the simple expedient of proffering false charges before a magistrate and thereby securing an arrest warrant.[10]

---

[7] The action for malicious prosecution grew out of the related action for conspiracy.    As early as 1293, various statutes were enacted to aid persons who had been falsely and maliciously indicted or accused of crimes by conspiracy among the defendants.    In such cases a writ of conspiracy was employed in seeking redress.    By the 16th century, this action was replaced by an action on the case in the nature of a conspiracy, but the allegation of a conspiracy was soon treated as surplusage.    The result was an action on the case.    See M. Bigelow, Leading Cases on the Law of Torts 190–191 (1875); 1 T. Street, The Foundations of Legal Liability 328–329 (1906); 2 W. Holdsworth, A History of English Law 366 (4th ed. 1936).

[8] See, e. g., *Blizard* v. *Kelly*, 2 Barn. & Cress. 283, 284, 107 Eng. Rep. 389 (K. B. 1823) ("The legal sense and meaning of those words is, that the party made the charge of felony before a magistrate"); *Davis* v. *Noak*, 1 Stark. 377, 382, 171 Eng. Rep. 502, 504 (N. P. 1816).

[9] See, e. g., *Fuller* v. *Cook*, 3 Leo. 100, 74 Eng. Rep. 567 (K. B. 1584); *Knight* v. *Jermin*, Cro. Eliz. 134, 78 Eng. Rep. 391 (K. B. 1589); *Clarke* v. *Postan*, 6 Car. & P. 423, 172 Eng. Rep. 1304 (N. P. 1834); *Wheeler* v. *Nesbitt*, 24 How. 544, 546 (1861); *Bunton* v. *Worley*, 4 Ky. 38 (1815); *Maddox* v. *Jackson*, 4 Munf. 462 (Va. 1815); *Hill* v. *Miles*, 9 N. H. 9, 13 (1837) (permitting an action for "maliciously and without reasonable or probable cause, charging a party with felony before a magistrate"); *Briggs* v. *Byrd*, 34 N. C. 377, 380 (1851); *Center* v. *Spring*, 2 Iowa 393 (1856); *Wilkinson* v. *Arnold*, 11 Ind. 45 (1858); *Rockwell* v. *Brown*, 36 N. Y. 207, 209 (1867).

[10] I reject the majority's conclusion that the issue of immunity for testimony by a police officer at a probable-cause hearing is not before this Court.    The majority emphasizes that the question presented in the petition for certiorari only mentions testimony by a police officer during a crim-

Even with respect to the common-law action for defamation which the majority discusses, I cannot agree that an absolute immunity for witnesses was well-settled law in 1871. In 1845, this Court had rejected both the rule of absolute im-

---

inal trial. *Ante*, at 329, n. 5. This literal reading of the question presented is contrary to our Rules, which provide that "[t]he statement of a question presented will be deemed to comprise every subsidiary question fairly included therein." This Court's Rule 21.1(a). See also *Peters* v. *Kiff*, 407 U. S. 493, 495 (1972) (MARSHALL, J, announcing the judgment of the Court and an opinion in which Douglas and Stewart, JJ., joined) (a challenge to the composition of a grand jury in the questions presented encompassed a challenge to the composition of the petit jury even though the question presented did not mention petit juries).

I believe that the question of witness immunity in one state-court criminal proceeding, the trial, fairly includes the issue of witness immunity in a related state-court criminal proceeding, the probable-cause hearing. The petition for certiorari in this case specifically referred to Officer LaHue's testimony at "several judicial proceedings relating to the state criminal prosecution," Pet. for Cert. 7, and it spoke in general terms about absolute witness immunity, *e. g.*, *id.*, at 14, 16–18, 20. Both petitioners and respondents obviously thought the issue was before us since they quoted lengthy excerpts from Officer LaHue's testimony at the probable-cause hearings in their briefs before this Court. See Brief for Petitioners 3–5; Brief for Respondents 2–4. Petitioner Briscoe has asserted respondent LaHue's liability for testimony at the probable-cause hearing throughout this proceeding. *E. g.*, App. 9–11, 17–22. Indeed, the District Court appeared to believe that the *only* issue raised by Briscoe's complaint involved testimony at a probable-cause hearing. See *Briscoe* v. *LaHue*, No. S 78–139 (ND Ind., Oct. 3, 1978), App. to Pet. for Cert. A–47. The Court of Appeals discussed the probable-cause hearing testimony, 663 F. 2d 713, 715, and its holding was framed in general terms regarding testimony at judicial proceedings, see *ante*, at 328, which would certainly include probable-cause hearings.

The majority nonetheless clearly leaves open the issue of immunity for testimony at a probable-cause hearing. *Ante*, at 329, n. 5. The absence of any immunity in such cases at common law should alone undermine any claim to absolute immunity under § 1983. In addition, the policy considerations applicable to testimony at a probable-cause hearing differ substantially from those relevant to testimony at a trial. For instance, the absence of cross-examination at probable-cause hearings increases the risk that false testimony will go undetected.

munity and its logical underpinnings, proposing instead that a plaintiff allege and prove malice in the case of privileged communications.

In *White* v. *Nicholls*, 3 How. 266 (1845), Justice Daniel wrote for a unanimous Court in dicta a veritable treatise on the law of defamation and privileged communications.[11] The Court began by noting the existence of various exceptions "which, in the elementary treatises, and in the decisions upon libel and slander, have been denominated privileged communications or publications." *Id.*, at 286. One of these "exceptions" was for "[w]ords used in the course of a legal or judicial proceeding, however hard they may bear upon the party of whom they are used." *Id.*, at 287. The Court then stated:

"But the term 'exceptions,' as applied to cases like those just enumerated, could *never* be interpreted to mean that there is a class of actors or transactions placed above the cognisance of the law, absolved from the commands of justice. It is difficult to conceive how, in society where rights and duties are relative and mutual, there can be tolerated those who are privileged to do injury *legibus soluti;* and still more difficult to imagine, how such a privilege could be instituted or tolerated upon the principles of social good. The privilege spoken of in the books should, in our opinion, be taken with strong and well-defined qualifications. It properly signifies this, and nothing more. That the excepted instances shall so far change the ordinary rule with respect to slanderous or libellous matter, as to remove the regular and usual presumption of malice, and to make it incumbent on the party complaining to show malice, either by the construction of the spoken or written matter, or by the facts and circumstances connected with that matter, or with the situation of the parties, adequate to authorize the conclusion." *Ibid.* (emphasis added).

_____

[11] The Court itself noted that its examination of the law was "extended" because of the "importance of [the] subject." 3 How., at 291.

The Court invoked these principles in discussing the specific exception for words used in a judicial proceeding, relying on the views of one English judge who had rejected absolute immunity.[12]

"With respect to words used in a course of judicial proceeding, it has been ruled that they are protected by the occasion, and cannot form the foundation of an action of slander *without proof of express malice; . . .* in the case of Hodgson *v.* Scarlett, 1 Barn. & Ald. 247, it is said by Holroyd, J., speaking of the words of counsel in the argument of a cause, 'If they be fair comments upon the evidence, and relevant to the matter in issue, then *unless malice be shown*, the occasion justifies them. If, however, it be proved that they were not spoken *bona fide*, or express malice be shown, then they may be actionable.'" *Id.,* at 288 (emphasis added).[13]

If Congress in 1871 actually examined the subject of common-law witness immunity, it could hardly have overlooked *White* v. *Nicholls* since that case was the sole pronouncement on the subject from the highest Court in the land. Congress might well have concluded—as did the Tennessee Supreme Court in 1871—that the principles enunciated in *White* were "settled law." *Saunders* v. *Baxter,* 53 Tenn. 369, 383. In an age when federal common law prevailed, see *Swift* v. *Tyson,* 16 Pet. 1 (1842), a Supreme Court decision would have been the natural focus for a Congress establishing a federal remedy which was accompanied by a new grant of federal jurisdiction.[14] In short, the most salient feature in the

---

[12]*Hodgson* v. *Scarlett,* 1 Barn. & Ald. 232, 246–247, 106 Eng. Rep. 86, 91 (K. B. 1818) (Holroyd, J.). See also *Kendillon* v. *Maltby,* Car. & M. 402, 409, 174 Eng. Rep. 562, 566 (N. P. 1842) (Lord Denman, C. J.); *Thomas* v. *Churton,* 2 B. & S. 475, 477, 121 Eng. Rep. 1150, 1151 (Q. B. 1862) (Cockburn, C. J.) (reserving the question).

[13] The Court explained that "falsehood and the absence of probable cause will amount to proof of malice." 3 How., at 291.

[14] This jurisdictional grant was contained in the Act of Apr. 20, 1871, § 1, 17 Stat. 13, and was the forerunner of 28 U. S. C. § 1343(3).

landscape of the common law at the time Congress acted was an opinion rebuffing absolute immunity in favor of a qualified immunity based on the absence of malice.[15]

---

[15] The views of the Supreme Court obviously conflicted with those expressed by some state-court judges. That is precisely the point: federal common law diverged from state common law as to witness immunity. The majority reasons as if state common law controlled the matter. See *ante*, at 331–333, and nn. 11, 12. Because federal common law prevailed when Congress enacted § 1983, and because the federal remedy provided in the Act was accompanied by a new grant of federal jurisdiction, I believe *White* v. *Nicholls* would have been the natural focus of attention for the 42d Congress. The majority does not explain why it thinks that the 42d Congress would instead have focused on state common law.

In any event, the majority's analysis of state-court decisions is sorely deficient. The proper inquiry in this case as defined by the majority itself is on common-law principles as understood by the Members of the 42d Congress. See *ante*, at 330. The 42d Congress enacted § 1983 in 1871. Yet the majority inexplicably relies on 11 cases decided *after* 1871. These cases are plainly irrelevant to the question of the 42d Congress' intent. Unless it was clairvoyant, the 42d Congress could not possibly have had access to most of the decisions relied on by the majority. By the same token, Congress certainly would not have had the benefit of the views of Van Vechter Veeder, *ante*, at 332, n. 12, who wrote his article in 1909.

The only arguably relevant support that the majority cites for the view that Congress extended absolute immunity to police officers who give perjurious testimony consists of eight state-court cases decided before 1871. *None* of these cases involved testimony by an official of the State, let alone a police officer, and the only support the majority can muster for the notion that the common-law witness immunity drew no distinction between public officials and private citizens is the 1909 article by Van Vechter Veeder. See *ante*, at 336, n. 15. In three of the pre-1871 cases, plaintiffs suing for defamation prevailed completely. In *Smith* v. *Howard*, 28 Iowa 51 (1869), and *White* v. *Carroll*, 42 N. Y. 161 (1870), the State Supreme Courts *affirmed* an award of damages recovered against a defendant who had slandered the plaintiff from the witness stand. Similarly, in *Perkins* v. *Mitchell*, 31 Barb. 461 (N. Y. 1860), the state court affirmed a trial court order rejecting a defendant's demurrer to a complaint. It held that a plaintiff *could* sue for defamatory statements made by a physician to a Justice of the Peace that resulted in the plaintiff's commitment as a lunatic. Whatever might have been said about immunity in these cases was, to use the majority's language, *ante*, at 332, n. 12, "purely dictum." Two other cases, *Hoar* v. *Wood*, 44 Mass. 193 (1841), and *Shelfer* v. *Gooding*, 47 N. C. 175

## III

The majority's decision is also predicated on its conclusion that there is "no evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions." *Ante*, at 337. In fact, there is considerable evidence in the legislative history that Congress did intend to abrogate the immunity of participants in state judicial proceedings.

## A

At petitioners' urging,[16] the Court has extensively examined the legislative history of § 2 of the 1871 Ku Klux Klan Act, 17 Stat. 13, now codified as 42 U. S. C. § 1985(3) (1976 ed., Supp. V). However, the forerunner of § 1983 was § 1 of the 1871 Act, not § 2. As the majority points out, *ante*, at 337, 340–341, the two sections differ significantly in their language and purpose. It is thus hardly surprising that the debates over § 2 shed little light on § 1. In my view the inquiry should focus on the history of § 1. Only by examining the

---

(1855), involved statements by *counsel* and not statements by a witness. This leaves three pre-1871 state cases upholding witness immunity, and these only as to private witnesses.

As between a smattering of state-court opinions and the extended and well-reasoned analysis of a unanimous Supreme Court, I think the latter would have commanded the attention of the Members of the 42d Congress. In fact, while Members of the 42d Congress displayed little interest in or familiarity with state-court decisions, they often focused on cases from the United States Supreme Court in their deliberations on the 1871 Act. See, *e. g.*, Cong. Globe, 42d Cong., 1st Sess., 375 (1871) (Cong. Globe) (Rep. Lowe) (citing *Prigg* v. *Pennsylvania*, 16 Pet. 539 (1842)); Cong. Globe, at 459 (Rep. Coburn) (citing *Cohens* v. *Virginia*, 6 Wheat. 264 (1821)); Cong. Globe, at App. 84 (Rep. Bingham) (citing *Barron* v. *Mayor of Baltimore*, 7 Pet. 243 (1833), and *Moore* v. *Illinois*, 14 How. 13 (1852)); Cong. Globe, at App. 188 (Rep. Willard) (citing the majority and dissenting opinions in the *Dred Scott* case, *Dred Scott* v. *Sandford*, 19 How. 393 (1857)); Cong. Globe, at 242 (Sen. Bayard) (citing *Withers* v. *Buckley*, 20 How. 84 (1858)); Cong. Globe, at App. 311 (Rep. Shellabarger) (citing *Jones* v. *Van Zandt*, 5 How. 215 (1847)).

[16] Brief for Petitioners 19–20.

genesis of that provision can it be determined whether Congress intended to abrogate certain common-law immunities.

The origin of § 1 is not open to serious question. The language and concept of the provision were derived in large part from § 2 of the Civil Rights Act of 1866, 14 Stat. 27.[17] The author of § 1 clearly stated the relationship between the two Acts in introducing the 1871 measure:

> "My first inquiry is as to the warrant which we have for enacting such a section as this [§ 1 of the 1871 Act]. The model for it will be found in the second section of the act of April 9, 1866, known as the 'civil rights act.' *That section provides a criminal proceeding in identically the same case as this one provides a civil remedy for,* except that the deprivation under color of State law must, under the civil rights act, have been on account of race, color, or former slavery. This section of the bill, *on the same state of facts,* not only provides a civil remedy for

---

[17] As enacted, § 1 of the 1871 Act read in pertinent part:

"That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress . . . ." Act of Apr. 20, 1871, § 1, 17 Stat. 13.

Section 2 of the 1866 Civil Rights Act read in pertinent part:

"That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court."

persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship." Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871) (emphasis added).

Because the two provisions are so intimately connected, a full examination of the history of § 1 of the 1871 Act must begin with § 2 of the 1866 Act.

## B

The Civil Rights Act of 1866 was the first federal statute to provide broad protection in the field of civil rights. Its primary purpose was to guarantee the newly emancipated Negro equality with whites before the law. Section 2 of the Act provided criminal liability for any person who, acting under color of law, deprived another of his rights because of race. This provision was extensively debated. Controversy centered in large part over its intended application to state officials integral to the judicial process.

The liability of state judicial officials and all official participants in state judicial proceedings under § 2 was explicitly and repeatedly affirmed.[18] The notion of immunity for such officials was thoroughly discredited. The Senate sponsor of

---

[18] See, e. g., Cong. Globe, 39th Cong., 1st Sess., 475–476 (1866) (exchange between Sen. Trumbull, the Senate sponsor of the bill, and Sen. Cowan); id., at 1155 (exchange between Rep. Thayer and Rep. Eldridge); id., at 1267 (Rep. Raymond) ("[I]f a judge or sheriff or any other officer of a State court should take part in enforcing any State law making distinctions among the citizens of the State on account of race or color, he shall be deemed guilty of a misdemeanor and punished with fine and imprisonment under this bill); id., at 500 (Sen. Cowan in opposition) (noting that "the judge, the constable, the sheriff, the marshal, and everybody" was liable under § 2); id., at 598 (Sen. Davis in opposition) ("All the parties" who participate in the unjust conviction of a Negro would be liable, including "the grand jury, the petit jury, the judge, and the officer of the law" who executes the judgment).

the Act deemed the idea "akin to the maxim of the English law that the King can do no wrong. It places officials above the law. It is the very doctrine out of which the rebellion [the Civil War] was hatched." Cong. Globe, 39th Cong., 1st Sess., 1758 (1866) (Sen. Trumbull). Thus, § 2 was "aimed directly at the State judiciary." *Id.*, at 1155 (Rep. Eldridge). See also *id.*, at 1778 (Sen. Johnson, member of the Senate Judiciary Committee) (§ 2 of the 1866 Act "strikes at the judicial department of the governments of the States").

Two unsuccessful efforts were made to amend § 2. First, Representative Miller introduced an amendment to exempt state judges from criminal liability. *Id.*, at 1156. Second, and of particular significance, Representative Bingham introduced an amendment to substitute a civil action for the criminal sanctions contained in the proposal. *Id.*, at 1266, 1271–1272. The sponsor of the 1866 Act, Representative Wilson, opposed the amendment largely on the ground that it would place the financial burden of protecting civil rights on poor individuals instead of on the government. *Id.*, at 1295. At the same time he stressed that there was "no difference in the principle involved" between a civil remedy and a criminal sanction. *Ibid.*

After the 1866 bill passed the Senate and House, President Andrew Johnson vetoed it. His opposition was based in part on the fact that § 2 of the bill "invades the judicial power of the State." Veto Message, in *id.*, at 1680. The President warned that "judges of the State courts . . . [and] marshals and sheriffs, who should, as ministerial officers, execute processes, sanctioned by State laws and issued by State judges, in execution of their judgments, could be brought before other tribunals and there subjected to fine and imprisonment for the performance of the duties which such state laws might impose." *Ibid.* Within two weeks, both the Senate and the House overrode the veto. Various Congressmen responded to the President's criticisms and freely admitted that § 2 of the legislation was aimed at state judicial systems. As a member of the House Judiciary Committee, Representative

Lawrence, declared: "I answer it is better to invade the judicial power of the State than permit it to invade, strike down, and destroy the civil rights of citizens. A judicial power perverted to such uses should be speedily invaded. The grievance would be insignificant." *Id.*, at 1837. See also *id.*, at 1758 (response of Sen. Trumbull to President's veto message); *id.*, at 1838 (statement of Rep. Clarke). The bill became law on April 9, 1866.

C

This Court has from time to time read § 1983 against the "background" of common-law tort liability.[19] Far more pertinent to this case, however, is the background provided by the 1866 Civil Rights Act. Representative Bingham, who had introduced the amendment to substitute civil liability for criminal liability in the 1866 Act, had become chairman of the House Judiciary Committee by the time of the 42d Congress. Senator Trumbull, the Senate sponsor of the 1866 Act, was chairman of the Senate Judiciary Committee in 1871. Representative Shellabarger, who had participated in the debates on the 1866 legislation,[20] drafted the 1871 Act.

Congress was well aware that the "model" for § 1 of the 1871 law could be found in the 1866 Civil Rights Act. Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871) (Rep. Shellabarger). The manager of the bill in the Senate, George Edmunds, stressed that § 1 was merely "carrying out the principles of the civil rights bill" that had been passed in 1866. *Id.*, at 568. Representative Coburn stated that § 1 "gives a civil remedy parallel to the penal provision" in the Civil Rights Act. "If this penal section is valid, and no one dares controvert it, the civil remedy is legal and unquestionable." *Id.*, at 461. See also *id.*, at 429 (Rep. McHenry in opposi-

---

[19] *E. g., Pierson* v. *Ray,* 386 U. S. 547, 556–557 (1967); *Monroe* v. *Pape,* 365 U. S. 167, 187 (1961). See *Carey* v. *Piphus,* 435 U. S. 247, 255 (1978); Nahmod, Section 1983 and the "Background" of Tort Liability, 50 Ind. L. J. 5 (1974).

[20] See, *e. g.,* Cong. Globe, 39th Cong., 1st Sess., 1293–1295 (1866).

tion) ("The first section of the bill is intended as an amendment of the civil rights act"); *id.*, at 365 (Rep. Arthur in opposition) (§ 1 is "cumulative, as far as it goes, with certain provisions in the civil rights bill").

The fact that § 2 of the Civil Rights Act was the model for § 1 of the 1871 Act explains why the debates in the 42d Congress on § 1 were so perfunctory.[21] Of all the measures in the Ku Klux Klan Act, § 1 generated the least controversy since it merely provided a civil counterpart to the far more controversial criminal provision in the 1866 Act. See *id.*, at 568 (Sen. Edmunds) ("The first section is one that I believe nobody objects to"); *id.*, at App. 313 (Rep. Burchard) ("To the first section, giving an injured party redress by suit at law in the United States courts in the cases enumerated, I can see no objections"); *Monell* v. *New York City Dept. of Social Services*, 436 U. S., at 665 (debate on § 1 was limited and the section passed without amendment); Developments in the Law—Section 1983 and Federalism, 90 Harv. L. Rev. 1133, 1155 (1977).

Opponents of § 1 of the 1871 Act repeated the same arguments that had been made against § 2 of the 1866 Act. They warned of the liability for judicial officers that would result from enactment of § 1.[22] Indeed, in portraying the inevitable consequences of the 1871 Act, Senator Thurman pointed to criminal prosecutions of state judicial officers that had already taken place under the 1866 Act.[23] These statements can hardly be dismissed as exaggerated rhetoric from opponents of the 1871 Act. Instead, they simply reflect the fact that the battle over liability for those integral to the judicial process had already been fought in 1866 when Congress

---

[21] Because discussion of § 1 of the 1871 Act was so limited, it is simply unrealistic to demand overwhelming evidence that the 42d Congress meant to override a common-law witness immunity. Surely the majority does not mean to define an inquiry that is inherently futile.

[22] See, *e. g.*, Cong. Globe, 42d Cong., 1st Sess., 365, 366, (1871) (statements of Rep. Arthur); *id.*, at 385 (statement of Rep. Lewis).

[23] *Id.*, at App. 217.

adopted the far more serious criminal sanction aimed at state judicial systems. Section 1, in contrast, provided for "the mild remedy of a civil action." Cong. Globe, 42d Cong., 1st Sess., 482 (1871) (Rep. Wilson, member of the House Judiciary Committee). So it was not surprising that the arguments of the opponents to the 1871 Act would fall on deaf ears. It is also noteworthy that Representative Shellabarger, who was hardly reluctant to interrupt speakers who were misconstruing his proposal,[24] never disputed the opponents' characterizations with regard to the liability of state judicial officers.[25]

To assume that Congress, which had enacted a criminal sanction directed against state judicial officials,[26] intended *sub silentio* to exempt those same officials from the civil counterpart approaches the incredible.[27] Sheriffs and marshals, while performing a quintessentially judicial function such as serving process, were clearly liable under the 1866 Act, notwithstanding President Johnson's objections. Be-

---

[24] *E. g., id.*, at 382, App. 46.

[25] On at least one of the occasions when such remarks were made, Representative Shellabarger was present. See Note, Liability of Judicial Officers Under Section 1983, 79 Yale L. J. 322, 328, n. 40 (1969).

[26] The majority does concede that witnesses can be punished criminally for violations of 18 U. S. C. § 242, the modern successor of § 2 of the 1866 Act. See *ante,* at 345, n. 32. It cannot go without mention that the classic English formulation of absolute witness immunity by Lord Mansfield, which even the majority quotes, *ante,* at 335, precluded civil or criminal liability. *King* v. *Skinner,* Lofft 54, 56, 98 Eng. Rep. 529 (K. B. 1772) ("[N]either party, witness, counsel, jury, or judge can be put to answer, civilly, *or criminally,* for words spoken in office") (emphasis added). Under early common law, perjury was not a punishable offense. Jurors were merely a body of witnesses whose verdict was based on their own personal knowledge and not on the evidence of others testifying before them. The only method of punishment was by a writ of attaint. See generally 4 W. Holdsworth, A History of English Law 515–519 (3d ed. 1924); *Damport* v. *Sympson,* Cro. Eliz. 520, 78 Eng. Rep. 769 (Q. B. 1596).

[27] See Kates, Immunity of State Judges under the Federal Civil Rights Acts, 65 Nw. U. L. Rev. 615, 622–623 (1970).

cause, as Representative Shellabarger stated, § 1 of the 1871 Act provided a civil remedy "in identically the same case" or "on the same state of facts" as § 2 of the 1866 Act, it obviously overrode whatever immunity may have existed at common law for these participants in the judicial process in 1871.

## D

The lack of historical support for witness immunity sharply contrasts with the substantial historical support for legislative immunity which this Court recognized in *Tenney* v. *Brandhove*, 341 U. S. 367 (1951), a case on which the majority relies. *Ante,* at 330, 334. Legislative immunity enjoyed a unique historical position since it had been conceived in the Parliamentary struggles of the 17th century and enshrined in the Speech and Debate Clause of the Constitution. The vast majority of States had adopted constitutional provisions providing a parallel protection against civil and criminal liability. See 341 U. S., at 372–375.

Moreover, the history of § 1 supports incorporation of legislative immunity. For example, when the specter of holding state legislators liable under § 2 of the 1866 Act was raised by President Johnson's veto message,[28] the Senate sponsor of the Act was quick to disavow any such intention. Senator Trumbull argued at some length that legislators did not fall within the scope of the Act because they "enact" laws rather than act "under color of" state law.[29] Whatever the validity of this distinction, it no doubt reflected the reluctance of Congress to impinge on the immunity of state legislators. But while the Radical Republican Congress was a "staunch advocate of legislative freedom," 341 U. S., at 376, it displayed no solicitude for state courts.[30] The debates over the 1871 Act are replete with hostile comments directed at state judicial

---

[28] See Cong. Globe, 39th Cong., 1st Sess., 1680 (1866).

[29] *Id.,* at 1758.

[30] See Developments in the Law—Section 1983 and Federalism, 90 Harv. L. Rev. 1133, 1150–1152 (1977).

systems.[31]   It is entirely reasonable to conclude that Congress intended to make state legislators immune from civil liability under § 1 of the 1871 Act.   No similar evidence exists to support an immunity for police officers testifying as witnesses.[32]

## IV

The majority also bases its decision on considerations of public policy, which purportedly mandate absolute immunity for police officers sued under § 1983 for their testimony as witnesses.   *Ante*, at 341–345.   This Court has recognized absolute immunity only in "exceptional situations" where public policy makes it "essential."   *Butz* v. *Economou*, 438 U. S. 478, 507 (1978).[33]   In my view, the case for official-witness immunity falls far short of this standard.

---

[31] See, *e. g.*, Cong. Globe, 42d Cong., 1st Sess., App. 78 (Rep. Perry) ("Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices"); *id.*, at 394 (Rep. Rainey) ("[T]he courts are in many instances under the control of those who are wholly inimical to the impartial administration of law and equity"); *id.*, at App. 186 (Rep. Platt) (judges exercise their "almost despotic powers . . . against Republicans without regard to law or justice"); *id.*, at App. 277 (Rep. Porter) ("The outrages committed upon loyal men there are under the forms of law.   It can be summed up in one word: loyal men cannot obtain justice in the courts . . ."); *id.*, at 429 (referring to "prejudiced juries and bribed judges").

[32] The history of § 1 of the 1871 Act casts some doubt on the correctness of *Pierson* v. *Ray*, 386 U. S. 547 (1967), and *Imbler* v. *Pachtman*, 424 U. S. 409 (1976).   *Pierson* and *Imbler* are distinguishable, however, on the ground that the policy considerations in those cases are far more powerful. Most significantly, judges and prosecutors must exercise a substantial amount of discretion in performing their official functions, while witnesses sworn to tell the truth do not.   See n. 39, *infra*.   In addition, we have only extended qualified immunity to police officers for the performance of many of their other duties.   See *Pierson, supra*, at 557.

[33] *Butz* involved an action under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971).   In my view, we should be even more reluctant to import absolute immunities into § 1983 suits than into *Bivens* ac-

Police officers and other government officials differ significantly from private citizens, around whom common-law doctrines of witness immunity developed. A police officer comes to the witness stand clothed with the authority of the State. His official status gives him credibility and creates a far greater potential for harm than exists when the average citizen testifies.[34] The situation is aggravated when the official draws on special expertise. A policeman testifying about a fingerprint identification or a medical examiner testifying as to the cause of a death can have a critical impact on a defendant's trial.[35] At the same time, the threat of a criminal perjury prosecution, which serves as an important constraint on the average witness' testimony, is virtually nonexistent in the police-witness context. Despite the apparent prevalence of police perjury,[36] prosecutors exhibit extreme

tions. First, with § 1983 we deal with explicit statutory language indicating the broad scope of the action, whereas *Bivens* actions have been implied by the federal courts. Second, the need to restrain state action implicit in the Fourteenth Amendment is implicated by § 1983 suits, while that Amendment has no relevance to suits against federal officials.

[34] See *Nugent* v. *Sheppard*, 318 F. Supp. 314, 317 (ND Ind. 1970). Cf. *Bivens* v. *Six Unknown Fed. Narcotics Agents, supra,* at 392 (agent acting in the name of the United States possesses "far greater capacity for harm" than individual trespasser acting on his own).

[35] Checks and balances built into the trial process may well have limitations and strategic costs. For instance, lengthy cross-examination of an official witness may expose weaknesses in his testimony only at the cost of emphasizing the evidence in the mind of the jury.

[36] See *United States* v. *Marshall*, 488 F. 2d 1169, 1171 (CA9 1973); *Veney* v. *United States*, 120 U. S. App. D. C. 157, 157–158, 344 F. 2d 542, 542–543 (1965) (Wright, J., concurring in judgment); *People* v. *Berrios*, 28 N. Y. 2d 361, 370, 270 N. E. 2d 709, 714 (1971) (Fuld, C. J., dissenting); *People* v. *Dickerson*, 273 Cal. App. 2d 645, 650, n. 4, 78 Cal. Rptr. 400, 403, n. 4 (1969); B. Tarlow, Search Warrants 31–77 (1973); New York City Commission to Investigate Alleged Police Corruption, Knapp Commission Report on Police Corruption (1972); Sevilla, The Exclusionary Rule and Police Perjury, 11 San Diego L. Rev. 839 (1974); Grano, A Dilemma for Defense Counsel: Spinelli-Harris Search Warrants and the Possibility of

reluctance in charging police officials with criminal conduct because of their need to maintain close working relationships with law enforcement agencies.[37]  The majority thus forecloses a civil sanction in precisely those situations where the need is most pressing.

Moreover, the danger that official witnesses would be inhibited in testifying by the fear of a damages action is much more remote than would be the case with private witnesses. Policemen normally have a duty to testify about matters involving their official conduct.  The notion that officials with a professional interest in securing criminal convictions would shade their testimony in favor of a defendant to avoid the risk of a civil suit can only be viewed with skepticism.  In addition, police officials are usually insulated from any economic hardship associated with lawsuits based on conduct within the scope of their authority.[38]  In any event, if the Court truly desires to give police officers "'every encouragement to make a full disclosure of all pertinent information within their knowledge,'" *ante*, at 335 (quoting *Imbler* v. *Pachtman*, 424 U. S., at 439 (WHITE, J., concurring in judgment)), then at the very least it should permit § 1983 suits which allege that officials withheld key information while testifying.[39]

---

Police Perjury, 1971 U. Ill. Law Forum 405, 408–409; Younger, The Perjury Routine, 204 The Nation 596 (1967); Comment, 60 Geo. L. J. 507 (1971); Note, 4 Colum. J. Law & Soc. Probs. 87, 96, n. 40 (1968).

[37] See Newman, Suing the Law Breakers, 87 Yale L. J. 447, 449–450 (1977).

[38] Police officers are generally provided free counsel and are indemnified for conduct within the scope of their authority.  See *Monell* v. *New York City Dept. of Social Services*, 436 U. S., at 713 (POWELL, J., concurring); Project, 88 Yale L. J. 781, 810 (1979).  This is certainly the state of the law with respect to respondents.  See Ind. Code Ann. §§ 34–4–16.5–5(b) and 34–4–16.5–18 (Burns Supp. 1982).

[39] Despite the differences between official witnesses and private witnesses, the majority contends that "immunity analysis rests on functional categories, not on the status of the defendant." *Ante*, at 342.  However, the cases cited for this proposition, *ante*, at 342, n. 28, all involve various types of *official* conduct.  The fact that individuals within the govern-

The majority's primary concern appears to be that § 1983 suits against police witnesses would impose "significant burdens on the judicial system and on law enforcement resources." *Ante*, at 343. As an empirical matter, this contention is unfounded. Both the Sixth Circuit and the District of Columbia Circuit have permitted such suits for over five years, see *ante*, at 328–329, n. 4, but there is no perceptible drain on legal resources in those Circuits compared to other Circuits that bar such lawsuits. Moreover, a comprehensive study of § 1983 suits filed in the Central District of California, which includes Los Angeles, indicates that only about 30 actions for false arrest were filed annually in that District.[40] Police officers arrest much more frequently than they testify, and an arrest will undoubtedly make many individuals disgruntled. Yet, lawsuits based on such allegations constituted only 0.5% of all cases filed in the Central District,[41] or an average of only one for every 243 full-time police

---

ment should be treated the same because of the functions they perform does *not* necessarily mean that individuals within the government should be treated the same as private parties.

While relying on functional categories, the majority ignores the classic distinction embodied in immunity cases between acts involving discretion and those that do not. See *Kendall* v. *Stokes* 3 How. 87, 98 (1845); *McCray* v. *Maryland,* 456 F. 2d 1, 3–4 (CA4 1972) ("Where an official is not called upon to exercise judicial or quasi-judicial discretion, courts have properly refused to extend to him the protection of absolute judicial immunity, regardless of any apparent relationship of his role to the judicial system"). Here, as the lower court noted, 663 F. 2d 713, 719, a witness normally exercises no discretion in the performance of his duty to answer fully and truthfully all questions put to him. As a result, "the need for absolute immunity seems correspondingly less compelling." *Id.,* at 720.

[40] See Eisenberg, Section 1983: Doctrinal Foundations and An Empirical Study, 67 Cornell L. Rev. 482, 550–551, 555 (1982). The statistics are for 1975–1976. The estimate given in the text is approximate because Professor Eisenberg has grouped statistics for prisoner § 1983 actions involving false arrest, assault, and search and seizure. See, *id.,* at 555, Table VI.

[41] A total of 5,810 cases were filed in the Central District of California in 1976. See Annual Report of the Director of the Administrative Office of the United States Courts 177, Table 18, 350, Table D–3 (1976).

officers in the city of Los Angeles.[42]   This does not appear to be a "significant burden."[43]   The simple fact is that practical obstacles alone are enough to deter most individuals from suing the police for official misconduct.[44]

In considering the competing interests at stake in this area, the majority strikes a very one-sided balance.   It eschews any qualified immunity in favor of an absolute one. Thus, the mere inquiry into good faith is deemed so undesirable that we must simply acquiesce in the possibility that government officials will maliciously deprive citizens of their rights.[45]   For my part, I cannot conceive in this case how patent violations of individual rights can be tolerated in the name of the public good.   "The very essence of civil liberty certainly consists in the right of every individual to claim the protections of the laws, whenever he receives an injury." *Marbury* v. *Madison,* 1 Cranch 137, 163 (1803).

---

[42] There were 7,294 full-time police officers employed by the city of Los Angeles in 1976.   See generally U. S. Dept. of Commerce, Bureau of the Census, City Employment in 1976, p. 8, Table 4 (1977) (data for all police department employees).

[43] Data from another State indicate that the California experience may overstate the burden of false arrest cases.   Over more than seven years, a *total* of only 32 § 1983 suits for false arrest were brought in Federal District Court for all or part of Connecticut.   See Project, 88 Yale L. J., *supra,* at 786, n. 23, 793.

[44] Former criminal defendants may well wish to avoid further entanglements with the legal system and are unlikely to have the resources needed to pursue such suits.   Lawyers will probably have little incentive to become involved in actions against the police, and those that do face an uphill struggle.   See Amsterdam, The Supreme Court and the Rights of Suspects in Criminal Cases, 45 N. Y. U. L. Rev. 785, 787 (1970) (civil actions against the police are "very rare, and until recently were so rare as to be insignificant, because the obstacles to their maintenance are formidable").

[45] Cf. 2 F. Harper & F. James, Law of Torts 1645 (1956) ("[I]t is stretching the argument pretty far to say that the mere inquiry into malice would have worse consequences than the possibility of actual malice . . . .   Since the danger that official power will be abused is greatest where motives are improper, the balance here may well swing the other way") (emphasis deleted).

## V

For all of the above reasons, I believe that the majority has failed to sustain the heavy burden required to justify an immunity so plainly at odds with the language and purpose of § 1983. I therefore respectfully dissent.

JUSTICE BLACKMUN, dissenting.

I join all of JUSTICE MARSHALL's dissenting opinion except Part I. I cannot join its Part I, for I adhere to the views I expressed for the Court in *City of Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 258–259 (1981), regarding the role played by history and policy in determining whether § 1983 incorporates a particular common-law immunity. It is proper to assume—indeed, the Court in the past has assumed—"that members of the 42d Congress were familiar with common-law principles . . . and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary." *Id.*, at 258. If an immunity was well established in the common law in 1871, careful analysis of the policies supporting it, and those supporting § 1983, governs the determination whether that immunity was retained.

In my view, JUSTICE MARSHALL's dissent convincingly demonstrates that the Court finds little support for its decision in the present case either in the language of the statute, the history of the common law, the relevant legislative history, or policy considerations.

I therefore dissent.