737 F.2d 246
 Augustin J. SAN FILIPPO, Plaintiff-Appellee,
v.
U.S. TRUST COMPANY OF NEW YORK, INC., J. Gregory Van Schaack
and Bruce P. Dennen, Defendants-Appellants,
Hon. Robert M. Morgenthau, District Attorney for the County
of New York, Appellee.
 Nos. 487, 488, Dockets 82-7355, 82-3033.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 6, 1984.
Decided June 14, 1984.
 
 Roger P. McTiernan, New York City (Barry, McTiernan & Moore, New York City, Michael F. Close, New York City, of counsel), for defendants-appellants.
 Alfred S. Julien, New York City (Julien, Schlesinger & Finz, P.C., David B. Turret, New York City, of counsel), for plaintiff-appellee.
 Ronald G. Blum, Asst. Dist. Atty. for the County of New York, New York City (Robert M. Morgenthau, Dist. Atty. for the County of New York, Mark Dwyer, Asst. Dist. Atty., New York City, of counsel), for appellee.
 Before LUMBARD and VAN GRAAFEILAND, Circuit Judges.*
 LUMBARD, Circuit Judge.
 
 
 1
 Augustin San Filippo, invoking federal jurisdiction under 42 U.S.C. Sec. 1983, brought suit in the Southern District against United States Trust Company of New York, Inc. (U.S. Trust), and two of its officers, J. Gregory Van Schaack and Bruce P. Dennen, alleging that they conspired with Matthew Crosson, an Assistant District Attorney (A.D.A.) of New York County, to deprive San Filippo of his civil and constitutional rights by falsely testifying to the grand jury concerning San Filippo's involvement in the fraudulent procurement of a $75,000 loan from U.S. Trust. Appellants Van Schaack and Dennen seek review of two interlocutory orders of the district court, denying their motions for summary judgment and for disclosure of the grand jury minutes, and ordering them to be deposed.
 
 
 2
 Appellants' nonfrivolous claim of absolute immunity from prosecution makes the district court's denial of summary judgment appealable under the "collateral final order" doctrine of Cohen v. Beneficial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). Although we decline to find absolute immunity here, as we assert jurisdiction because of this claim, we exercise our pendent appellate jurisdiction to review all other grounds raised by appellants below in support of summary judgment. We conclude that plaintiff's failure to allege any material facts to support his conclusory allegation of conspiracy warrants summary dismissal of his complaint under either Fed.R.Civ.P. 12(b)(6) or Fed.R.Civ.P. 56. We therefore remand to the district court and direct entry of judgment for the defendants.
 
 I.
 
 3
 This suit grows out of a 1979 New York County criminal prosecution of plaintiff-appellee Augustin San Filippo, attorney to Dora Dodge Moran and Daniel Moran, for aiding the Morans in procuring $75,000 in loans from U.S. Trust in 1977, on the strength of a forged instrument purporting to make Dora Moran the beneficiary of a $9 million trust. We summarize the salient facts leading up to that prosecution, which were recited in the statement of material facts submitted with defendants' motion for summary judgment, and as to which plaintiff in his opposing papers raised no genuine issue. See Local Rule 3(g), Southern District of New York (facts stated by movant deemed admitted unless controverted by opposing party).
 
 
 4
 The Dodge Estate. In 1953, Dora Dodge Moran, nee Dora Felstad, married Horace E. Dodge Jr., whose father and uncle had sold the Dodge automobile company in 1920 for $120 million. Horace E. Dodge Sr. died later that year, leaving to his widow Anna Thompson Dodge approximately $60 million invested in municipal bonds.
 
 
 5
 Before their marriage, Horace Jr. had agreed to leave Dora $1 million upon his death, which agreement was guaranteed by Anna Thompson Dodge. A son, John Francis Dodge, was born to Horace Jr. and Dora in 1954. Horace Jr. died in 1963, leaving Dora as his widow, and $12 million in debts and no assets.
 
 
 6
 In 1964, Dora sued Anna Thompson Dodge for the $1 million guaranteed in the prenuptial agreement and for $9 million for alienating the affection of Dora's deceased husband, who had begun divorce proceedings against Dora prior to his death. The suit was settled in April 1964 by the payment of $1,065,795 to Dora. Regarding Dora's later claims to be the beneficiary of a $9 million trust, no such trust ever existed, and Anna Thompson Dodge never set aside bonds or additional money for Dora in any other form.
 
 
 7
 Dora became Mrs. Dora Dodge Moran when she married her former bodyguard, Daniel Moran, in 1965. When Anna Thompson Dodge died in 1970 at age 106, Dora's son, John Francis Dodge, inherited about $5,600,000 under the will of his grandfather, Horace E. Dodge Sr. As John was a minor, his inheritance was placed in a custody account, with Dora and Daniel Moran named as guardians.
 
 
 8
 San Filippo's representation of the Morans. Commencing in 1972, San Filippo represented Dora Dodge Moran in numerous financial transactions, including the purchase and sale of residences, investments in businesses, and the borrowing of money to sustain the lavish lifestyle of the Morans. In July of that year, San Filippo wrote to a business broker as attorney for the Morans, making the first of many representations that Dora Moran was the beneficiary of a large trust from Anna Thompson Dodge: "[T]he bulk of [the Morans'] assets in municipal bonds is in excess of $5,000,000, none of which are pledged or have liens on them, nor can they be due to the provision of a trust resulting from a settlement with Mrs. Dodge. Distribution of these assets is awaiting the final liquidation of the Dodge estate...". None of this was true.
 
 
 9
 In April 1973, San Filippo made a similar claim in a letter to Manufacturers Hanover Trust Company about a loan for the Morans, enclosing a document representing them to be the owners of $5 million in municipal bonds, distribution of which was awaiting final disposition of the family estate. The list of bonds sent with the letter was almost identical to the list in the fraudulent trust agreement delivered to U.S. Trust on January 11, 1977.
 
 
 10
 In 1973 and 1974, San Filippo acted as counsel for the Morans in their acquisition of Dandor International, of which he became general counsel with an annual retainer of $25,000, and Walker Tool and Die, of which he became vice president. In January 1974, San Filippo attended a closing of Dora Moran's purchase of a Fifth Avenue apartment, and in July of that year he attended the closing of the Morans' purchase of property in Palm Beach, Florida, financed with $1,450,000 in mortgage funds obtained from the Teamsters' Local Pension Fund. In 1975, San Filippo also represented the Morans regarding their $15,000 indebtedness to American Express, for which judgment was entered against them.
 
 
 11
 Meanwhile, in March 1973, when Dora's son John turned 18, San Filippo arranged for the $3,900,000 then remaining in his custody account to be transferred to a spendthrift trust, of which San Filippo was designated as a trustee with the Morans. At the same time, he also opened up a revolving loan account at a different bank in the name of the trust, with the trust assets pledged as collateral, and with himself, Dora Moran and Daniel Moran as signatories. From 1973 to 1976, sums in excess of $1.5 million were borrowed through the loan account. San Filippo denied negotiating those loans or signing off on the disbursements, most of which ultimately proved to be for the private benefit of Dora and Daniel Moran. However, he was aware that the outstanding loans frequently exceeded $1 million, and that as they came due, they were either rolled over into larger loans or repaid out of the son's trust funds.
 
 
 12
 In May of 1976, San Filippo was presented with an account statement for the trust fund, showing a balance of $193,750. According to the statement, of the $3.9 million principal in the fund when it was opened in 1973, about $1.5 million had gone to repay loans to the trust fund loan account, and the balance to repay various other loans, including $475,000 of the mortgage on the Morans' Palm Beach property obtained from the Teamsters' Local Pension Fund, creditors of the Morans, or directly to the Morans. At his trial, San Filippo acknowledged thinking it was "irregular" that the trust fund had been depleted to virtually nothing and that $1.5 million had apparently been disbursed from the trust fund loan account without his required signature. He testified that he began investigation into those irregularities in the summer of 1976, and ultimately came to the belief that the Morans had breached their trust to Dora's son by using his trust fund for their own purposes--a belief confirmed by Dora's subsequent guilty plea in June 1979 to looting her son's account while acting as his guardian and trustee.
 
 
 13
 Notwithstanding any suspicions San Filippo might have had by late 1976 concerning the Morans, he continued to represent them in their financial dealings. In December 1976, when he was contacted, at Dora's suggestion, by an officer of The Chase Manhattan Bank concerning an $11,000 overdraft by Dora, San Filippo confirmed that she was the beneficiary of a $9 million trust currently in probate, detailing the holdings of the trust to support that story. On January 3, 1977, San Filippo reconfirmed the existence of the $9 million trust fund to the officer from Chase, and also assured the officer that U.S. Trust--whom he had yet to approach--was considering making the Morans a "substantial loan."
 
 
 14
 We come now to the representations made to U.S. Trust in January 1977, which formed the basis of San Filippo's criminal prosecution. On January 10, San Filippo called Van Schaack at U.S. Trust and told him that his clients, Dora and Daniel Moran, were interested in borrowing money from the bank. He informed Van Schaack that Dora was the beneficiary of a $9 million trust, and that she might possibly be interested in depositing the proceeds with U.S. Trust when they became available. At a meeting later that day between Dennen, Van Schaack, San Filippo and the Morans, San Filippo reconfirmed the existence of the $9 million trust, and defendants requested to see a copy of the agreement. In reliance on San Filippo's and the Morans' representations concerning the trust, the possibility of attracting the corpus of the $9 million trust, and the possibility (which never materialized) of a third party guaranty of the loan, U.S. Trust approved a $55,000 unsecured loan for the Morans that same day.
 
 
 15
 The following day, San Filippo delivered to Van Schaack a copy of the trust agreement, which had been given to him by Dora Moran. The trust agreement ultimately turned out to be a forgery. At the same time, San Filippo suggested that U.S. Trust consider an additional loan of $450,000 to the Morans, to be secured by a surety bond. To that end, San Filippo presented a letter just received from a George Foundos in Chicago, indicating interest in providing a surety bond for that amount, upon receipt, inter alia, of documents and audits establishing the validity and value of the $9 million trust.
 
 
 16
 On January 12, in response to Foundos' request for verification of the trust, San Filippo sent Foundos a lengthy letter purporting to quote the pertinent sections of the trust agreement. San Filippo, however, had deleted the name of the bank (Detroit Bank and Trust Co., Detroit, Michigan) listed as trustee in one of the quoted provisions.[1] San Filippo stated that based on his own examination of the agreement, which on its face appeared duly executed, and on the fact that "[he] knew from [his] own observations and as a result of [his] professional relationship with her that Mrs. Moran has been receiving the income from that trust since its creation and has been able to live luxuriously on that income with [three] expensive homes ..., all of which are staffed at all times,"[2] in his opinion the trust agreement was bona fide. In addition, San Filippo stated that "an attorney for the executor of the Anna Thompson Dodge will" had advised him in a telephone discussion--referring apparently to a December 1976 phone conversation set up by Dora Moran--[3] that distribution of Dora's $9 million had to await final probate of the estate, which would be no later than November 1977. Finally, he stated that:
 
 
 17
 In order not to further complicate the administration of the Anna Thompson Dodge estate and create any problems that could postpone an expeditious termination of the probate proceedings Mrs. Moran would prefer and has instructed that no direct inquiries be made with respect to the trust and the administration of the estate. An agreement has been made with all interested parties, i.e. the heirs, herself, trustees and the various attorneys involved, to that effect and Mrs. Moran intends to maintain that agreement at all costs.
 
 
 18
 San Filippo simultaneously sent a copy of the letter to Dennen at U.S. Trust.
 
 
 19
 Upon receipt of the letter, Foundos told San Filippo he thought it was "ridiculous" on its face, as San Filippo had failed to provide any outside audit of the trust agreement as requested. In response, San Filippo reiterated to Foundos that it was a "secret trust," and that San Filippo's opinion vouching for its authenticity was as good as a court opinion. On January 17, 1977, Foundos notified Dora Moran and San Filippo that he would not pursue their application for a surety bond.
 
 
 20
 On January 20, 1977, Van Schaack contacted Philip Van Zile, the attorney for Anna Dodge since 1930 and one of the two co-executors and co-trustees of her estate. Van Zile told Schaack that he had never heard of the $9 million trust purportedly to go to Dora Moran. U.S. Trust never granted the $450,000 additional loan, but despite Van Zile's disclaimer, on February 4, 1977, Van Schaack approved an additional $20,000 loan to the Morans, purportedly to be used to buy out partners in a South American mining venture.[4]
 
 
 21
 From February through the fall of 1977, San Filippo continued to act as attorney to the Morans, travelling with them to Bogota, Colombia, and Europe in connection with their financial dealings, vouching for the authenticity of the trust to a potential lender in an opinion letter substantially identical to the letter sent to George Foundos,[5] and vouching for the trust verbally to an FBI agent, concluding with the statement that he had received the information from Mrs. Moran "and had checked it out and knew that it was factual."
 
 
 22
 Indictment of the Morans and San Filippo. In the early part of 1978, the District Attorney of New York County began an investigation of the Morans. By March or April, the D.A. had become aware that Dora Moran had represented to potential lenders (other than U.S. Trust) that she was the beneficiary of a $9 million trust. Investigators sent to Detroit by the D.A.'s office discovered that there was no such trust.
 
 
 23
 Meanwhile, in March 1978, the Morans filed for bankruptcy in the Southern District of Florida. When this came to the attention of the D.A.'s office, Matthew Crosson assigned Sergeant Woike to interview the list of creditors in the bankruptcy action. In May 1978, Woike contacted U.S. Trust, which was listed as being owed $79,000 (presumably the total of $75,000 in loans plus interest). U.S. Trust itself had made no prior move to contact the D.A.'s office or the New York City Police Department. In response to questioning by Woike, Van Schaack and Dennen stated that San Filippo had represented to them that Dora Moran was the beneficiary of a $9 million trust, partially in reliance on which U.S. Trust had approved $75,000 in loans. Woike reported that information to Crosson, and Crosson confirmed it directly in conversations with Van Schaack and Dennen prior to their grand jury testimony.
 
 
 24
 In May 1978, Crosson presented evidence to the grand jury against the Morans and San Filippo concerning, inter alia, fraudulent procurement of the U.S. Trust loans. Pursuant to a subpoena, Van Schaack and Dennen testified before the grand jury to the events surrounding the $75,000 loans, including San Filippo's alleged representations to them, and produced various documents from the U.S. Trust files. No evidence has been adduced at any point to suggest that Van Schaack, Dennen or U.S. Trust ever requested Crosson, to present evidence to the grand jury or to prosecute San Filippo.
 
 
 25
 In June 1978, the grand jury indicted San Filippo on two counts of larceny in the second degree, arising from the two loans secured by the Morans from U.S. Trust. It indicted Dora and Daniel Moran on one count of larceny by false pretences, arising from the two U.S. Trust loans, and one count of bilking Dora's son's trust fund of $390,000 while acting as guardians of his account before he reached his majority. In an interview with San Filippo after his arrest, A.D.A. Crosson attempted to elicit San Filippo's cooperation in the government's case against the Morans, in particular with regard to the $1,450,000 in loans from the Teamster's Local Pension Fund. San Filippo denied any participation in the transactions, which Crosson knew from documentary evidence to be false, and discussions concerning San Filippo's possible cooperation were dropped.
 
 
 26
 In August 1978, Daniel Moran died of a gunshot wound, later ruled a suicide. In June 1979, Dora Moran pleaded guilty to both charges against her. On June 28, 1979, San Filippo's trial commenced in New York State Supreme Court. On July 12, after a day and a half of deliberation, the jury acquitted him.
 
 
 27
 San Filippo's civil suit. In January 1981, San Filippo commenced this Sec. 1983 action in the Southern District, charging that U.S. Trust, through its officers Van Schaack and Dennen, had deprived San Filippo of his civil and constitutional rights, including his right to be free from malicious prosecution, by conspiring with A.D.A. Crosson to present false testimony to, and withhold exculpatory evidence from, the grand jury concerning San Filippo's role in securing the Morans' U.S. Trust loan. Although the complaint specified the general nature of the false testimony and exculpatory evidence allegedly at issue, it contained no factual assertions to support the allegations of "agreement" or "conspiracy" between defendants and Crosson.
 
 
 28
 In their answer and amended answer, defendants asserted several affirmative defenses, including their absolute immunity from Sec. 1983 liability for their grand jury testimony or prior discussions with the prosecutor.
 
 
 29
 After both sides exchanged preliminary discovery requests, defendants, with the support of plaintiff, moved below for orders unsealing the grand jury minutes. Judge Gagliardi referred all discovery matters to Magistrate Tyler, who, on January 13, 1982, ordered the grand jury minutes to be unsealed and disclosed to counsel. D.A. Robert Morgenthau appealed the disclosure order to Judge Gagliardi, who overruled it by order on April 12, 1982, on the ground that defendants had failed to show any particularized need for the minutes, as required by law. Defendants appealed that order and petitioned for mandamus to this court, arguing that the district court lacked jurisdiction under 28 U.S.C. Sec. 636(b)(1)(A) to overrule Magistrate Tyler's order directing disclosure of the minutes.
 
 
 30
 While that appeal was still pending, defendants moved on July 7, 1982, before Magistrate Tyler for a protective order against being subject to further discovery, on the ground that Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (June 24, 1982), forbade discovery from proceeding until the threshold issue of an immunity defense had been resolved. Magistrate Tyler denied that motion and ordered Van Schaack and Dennen to be deposed within ten days or have their answer stricken. On July 30, 1982, defendants appealed that order to Judge Gagliardi, and simultaneously moved for dismissal under F.R.C.P. 12(b)(6) or, in the alternative, for summary judgment. In support of both motions, defendants asserted, in addition to their defense of absolute immunity, that malicious prosecution was not actionable under Sec. 1983; that plaintiff's conclusory allegations that defendants had conspired with A.D.A. Crosson were insufficient to meet the "under color of state law" requirement of Sec. 1983; that plaintiff's multiple admitted false representations established probable cause for his prosecution as a matter of law; that plaintiff was collaterally estopped from challenging the sufficiency of the evidence to support the charges against him because he twice litigated that issue in his criminal trial and lost; and that plaintiff's action was time-barred.
 
 
 31
 In his opposition papers, plaintiff controverted none of the material facts stated by defendants in support of their motion for summary judgment. His attorney, Bradford Cooke, submitted his own affirmation reiterating the facts plaintiff alleged to have been falsely given or wrongly withheld by defendants in the grand jury proceeding, most of which went to the question of whether U.S. Trust had relied on representations concerning the $9 million trust in approving the loan. In support of plaintiff's allegation of conspiracy, Cooke's affirmation stated only that:
 
 
 32
 The deposition of Crosson ... reveal[ed] the opportunity for the defendants and Crosson to conspire and agree to deprive plaintiff of a substantial liberty interest....
 
 
 33
 The opportunities were: the Woike-Van Schaack interview, the Cross [sic]--Van Schaack interview, the Woike-Dennen interview, and the Cross [sic]--Dennen interview.
 
 
 34
 On July 5, 1983, Judge Gagliardi denied summary judgment for defendants, affirmed Magistrate Tyler's deposition order, and denied defendants' further request that they be allowed in camera inspection of the grand jury minutes.
 
 
 35
 Defendants now seek interlocutory review of: (1) the April 12, 1982, order denying disclosure of the grand jury minutes for failure to show particularized need; and the July 5, 1983, order (2) denying in camera inspection of the grand jury minutes on the same ground, (3) denying summary judgment to defendants, and (4) affirming Magistrate Tyler's order requiring defendants to submit to depositions. Appellee D.A. Morgenthau opposes only the first two challenges, which seek disclosure of the sealed grand jury minutes. Appellee San Filippo, who supported defendants' request for disclosure of the grand jury testimony below, opposes only the third and fourth challenges, pertaining to summary judgment and depositions of defendants. Judge Gagliardi, agreeing that there was at least arguable jurisdiction over the appeal, granted defendants' motion to stay the deposition order pending this appeal.II.
 
 
 36
 All four rulings that appellants here challenge are nonfinal orders within the meaning of 28 U.S.C. Sec. 1291, and hence as a general rule are not reviewable prior to final judgment. See Pacific Union Conference of Seventh-Day Adventists v. Marshall, 434 U.S. 1305, 1306, 98 S.Ct. 2, 3, 54 L.Ed.2d 17 (1977) (denial of summary judgment); Xerox Corp. v. SCM Corp., 534 F.2d 1031, 1031-32 (2d Cir.1976) (per curiam) (discovery orders); see generally 8 C. Wright & A. Miller, Fed.Pract. & Proced. Sec. 2006 (1970); 10 C. Wright, A. Miller & N. Kane, Fed.Pract. & Proced. Sec. 2715 (1976). Therefore, before reaching the merits of appellants' arguments, we address the threshold question of our jurisdiction to review any of those decisions on interlocutory appeal, under some exception to the finality requirement of Sec. 1291.
 
 
 37
 We conclude that both the denial of summary judgment and the order requiring defendants to be deposed are properly before this court under the "collateral final order" doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949), at least insofar as the district court premised its decisions on a rejection of defendants' asserted absolute immunity defense. Cohen provides that non-final orders may be appealed when they conclusively resolve important and disputed questions that are completely separable from, and collateral to, the merits of the action, and are effectively unreviewable on appeal from a final judgment. Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978).
 
 
 38
 The Supreme Court has held on several occasions that interlocutory orders denying claims of absolute immunity are appealable under Cohen. See, e.g., Nixon v. Fitzgerald, 457 U.S. 731, 742-43, 102 S.Ct. 2690, 2698, 73 L.Ed.2d 349 (1982) (Presidential immunity); Helstoski v. Meanor, 442 U.S. 500, 506-08, 99 S.Ct. 2445, 2448, 2449, 61 L.Ed.2d 30 (1979) (immunity under Speech and Debate Clause); Abney v. United States, 431 U.S. 651, 659-62, 97 S.Ct. 2034, 2040-2041, 52 L.Ed.2d 651 (1977) (immunity under Double Jeopardy Clause). The rationale for allowing interlocutory appeal in such cases is succinctly stated in Briggs v. Goodwin, 569 F.2d 10, 59 (D.C.Cir.1977) (Wilkey, J., writing separately for the court on appealability), cert. denied, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978): absolute immunity is granted "as much to protect the relevant persons from a trial on their actions as it is to protect them from the outcome of trial," and the former protection will be lost if denial of the immunity defense cannot be appealed until final judgment.
 
 
 39
 Furthermore, it is settled under Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), that a witness has absolute immunity from Sec. 1983 liability based on the substance of his trial testimony. Although the Court in Briscoe left the question open, id. at 1112 n. 5, it must follow that grand jury witnesses should be similarly protected. See Kincaid v. Eberle, 712 F.2d 1023 (7th Cir.1983); cf. Dale v. Bartels, 552 F.Supp. 1253, 1267-73 (S.D.N.Y.1982) (finding such immunity pre-Briscoe ). Thus, had plaintiff sued defendants on the basis of allegedly false grand jury testimony, and had Judge Gagliardi denied defendants' motion for summary judgment on grounds of absolute immunity, that denial would be ripe for interlocutory review, and we believe reversal, under Nixon and Briscoe.
 
 
 40
 However, plaintiff has based his Sec. 1983 claim not on defendants' testimony, but on their alleged conspiracy with the D.A.'s office to present false testimony and to withhold exculpatory evidence in the course of criminal proceedings. As Judge Gagliardi noted in rejecting defendants' immunity defense to that charge, no court has yet held that absolute immunity from prosecution for false testimony extends to conspiracy with public officials to present false testimony. However, the mere fact that the merits of defendants' claim to absolute immunity are unsettled does not of itself defeat their right to interlocutory review of that claim at this point. As the D.C. Circuit noted in McSurely v. McClellan, 521 F.2d 1024, 1032 (1975), in taking interlocutory review of a claim of immunity under the Speech and Debate Clause: "[T]he question of appealability does not turn on the correctness of an appellant's claim (at least so long as it is not frivolous). Rather, the issue is whether his right to appellate review of that claim--whether ultimately successful or not--will be effectively lost if jurisdiction is denied."
 
 
 41
 In the instant case, defendants have alleged substantial enough arguments in favor of extending immunity for false testimony itself to conspiracies to testify falsely, see infra, to defeat any suggestion that their claim ofimmunity is frivolous. Furthermore, in the event that claim did prevail, the argument made in Briggs v. Goodwin, supra, for the ineffectiveness of appeal from final judgment when immunity rights are abridged would apply with equal force here. Therefore, we conclude that defendants are entitled to interlocutory review of their immunity claim.
 
 
 42
 Having said that, we nonetheless reject the absolute immunity claim on its merits. Briscoe v. LaHue, supra, was expressly limited to immunity for testimony given in judicial proceedings, and its rationale--to encourage witnesses to come forward with all they know--does not justify extending that immunity to cover extra-judicial conspiracies between witnesses and the prosecutor to give false testimony. Nor do we find persuasive defendants' argument that absent the immunity they now seek, every witness could be intimidated by the prospect of defending a civil suit charging 'conspiracy' to give false testimony, just as easily as a suit charging false testimony. Insofar as witnesses may face groundless 'conspiracy' suits, ample protection against costly defense should ordinarily be provided by the possibility of 12(b)(6) dismissal or summary judgment in defendants' favor.
 
 
 43
 As defendants' opposition to the deposition order was based solely on their claim of absolute immunity, our rejection of that claim disposes of defendants' challenge to that portion of Judge Gagliardi's order.
 
 
 44
 However, defendants raised several additional grounds in the district court in support of their motion for 12(b)(6) dismissal or, in the alternative, summary judgment. See supra. None of these alternative grounds would in its own right merit interlocutory review under Cohen. However, under the doctrine of pendent appellate jurisdiction, once we have taken jurisdiction over one issue in a case, we may, in our discretion, consider otherwise nonappealable issues in the case as well, where "[t]here is sufficient overlap in the factors relevant to [the appealable and nonappealable] issues to warrant our exercising plenary authority over [the] appeal." Sanders v. Levy, 558 F.2d 636, 643 (2d Cir.1976), aff'd en banc, 558 F.2d 646, 647-48 (1977), rev'd on other grounds sub nom. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); accord Marcera v. Chinlund, 595 F.2d 1231, 1236-37 n. 8 (2d Cir.), vacated on other grounds sub nom. Lombard v. Marcera, 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979); see also San Filippo v. United Bro. of Carpenters & Joiners, 525 F.2d 508, 512-13 (2d Cir.1975) (motion to dismiss considered pendent to denial of preliminary injunction); Hurwitz v. Directors Guild of America, Inc., 364 F.2d 67, 70 (2d Cir.1966) (same). We have invoked that discretionary power to consider issues presenting considerably less overlap than exists here, see Holt v. The Continental Group, Inc., 708 F.2d 87, 92 n. 4 (2d Cir.1983) (denial of attorney disqualification motion considered as pendent to denial of preliminary injunction); Green v. Wolf Corp., 406 F.2d 291, 302 (2d Cir.1968); cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969) (order striking prayer for punitive damages considered as pendent to denial of class action). In view of that fact, and the waste of judicial resources were this suit to go forward, we see every reason to invoke that power in this case.
 
 
 45
 Reviewing the record with respect to defendants' motions for summary dismissal, we conclude that San Filippo's completely unsubstantiated allegations of conspiracy are insufficient to state a valid claim for relief under Sec. 1983, or, in the alternative, to defeat defendants' motion for summary judgment.
 
 
 46
 In holding to the contrary, the district court stated only that "[b]ecause on the record before the court, factual issues with regard to the existence of [the alleged] conspiracy remain in dispute, defendants are not entitled to summary judgment on the basis of their argument that they did not act under color of state law." However, after reviewing the papers submitted by the parties on the summary judgment motion, we are unable to find any genuine issue of fact raised with respect to the conspiracy allegation. The undisputed evidence shows that the sum total of defendants' involvement with San Filippo's prosecution is as follows. When questioned by Sergeant Woike, pursuant to a check of all creditors listed on the Morans' bankruptcy petition, defendants gave Woike their version of what had transpired in negotiations for the loan, including San Filippo's representations concerning the existence of the $9 million trust. They restated that information in a subsequent conversation with A.D.A. Crosson, initiated by Crosson, and so testified before the grand jury, pursuant to a subpoena from the government, at the same time providing documentary evidence subpoenaed by the state. There is no evidence whatsoever suggesting that defendants ever initiated any contact with the state concerning this case, or ever urged the state to prosecute San Filippo.
 
 
 47
 Even assuming some legitimate basis for charging that the defendants had given any false testimony--of which on this record we have no evidence whatever--San Filippo is precluded from bringing suit on that ground both because a private party giving testimony is not "acting under color of state law" for purposes of Sec. 1983, see Briscoe v. LaHue, supra, 460 U.S. at ----, 103 S.Ct. at 1113, and because all witnesses, whether private parties or government officials, have absolute immunity from damages liability for their testimony under Briscoe.
 
 
 48
 Undoubtedly mindful of both obstacles, plaintiff has based his claim instead on defendants' alleged conspiracy with A.D.A. Crosson and Sergeant Woike to present false testimony to the grand jury--a charge which, if substantiated, would supply the necessary state involvement for a Sec. 1983 claim and avoid automatic dismissal under the Briscoe immunity defense. However, at no point in the proceedings has plaintiff alleged one shred of evidence in support of his conclusory assertion of conspiracy, beyond the fact that A.D.A. Crosson and Detective Woike met with defendants prior to their grand jury testimony. We see nothing suspicious or improper in such meetings, which are routine and necessary in the preparation of evidence. If the mere allegation of their occurrence is sufficient to create a material issue of fact as to whether something improper took place during them, we agree with appellants that virtually every witness for the government could face the burden of defending a costly civil suit charging 'conspiracy' to give false testimony. Although we decline to recognize absolute immunity from suits alleging conspiracy on that ground, see supra, we think it is imperative for courts to examine with great care any suit charging that prosecution witnesses conspired with the prosecutor, and to dismiss on pre-trial motion those that are clearly baseless. See Ellentuck v. Klein, 570 F.2d 414, 426 (2d Cir.1978); Powell v. Workmen's Compensation Board, 327 F.2d 131, 137 (2d Cir.1964).
 
 
 49
 We therefore hold that plaintiff's conclusory allegations of conspiracy are insufficient to survive either a 12(b)(6) motion for dismissal, see Slotnick v. Garfinkle, 632 F.2d 163 (1st Cir.1980); Ellentuck v. Klein, supra; Ostrer v. Aronwald, 567 F.2d 551 (2d Cir.1977) (per curiam); Grow v. Fisher, 523 F.2d 875 (7th Cir.1975), or in the alternative a motion for summary judgment in defendants' favor, see Baxter v. Lewis, 421 F.Supp. 504, 507 (W.D.Va.1976); cf. Fed.R.Civ.P. 12(b) (Rule 12(b)(6) motion may be treated as motion for summary judgment if matters outside pleadings are considered). We therefore reverse the denial of defendants' motion for dismissal, and remand to the district court with instructions to dismiss the complaint.
 
 
 50
 As we are dismissing plaintiff's suit on this basis, we need not discuss the other arguments raised by defendants in support of summary dismissal and rejected by the district court.[6]
 
 
 51
 Reversed and remanded with instructions to dismiss the complaint.
 
 
 
 *
 At argument, the Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, recused himself. The parties then consented that the case be determined by Judges Lumbard and Van Graafeiland, as authorized by Sec. 0.14(b) of the Rules of this court
 
 
 [1]
 As the inclusion of that name would have enabled Foundos quickly to discover on his own that the trust agreement was a fraud, the government cited to San Filippo's deliberate exclusion of the name as evidence of his guilty intent
 
 
 [2]
 As the trust never existed, San Filippo obviously could not have "known" from his own observations that Mrs. Moran was receiving the income from it. Furthermore, the state argued he could hardly have inferred it from their ability to sustain a lavish lifestyle, as he himself had helped them negotiate over a million dollars in loans from 1972 to 1977, and knew at least by May 1976 that a substantial part of the almost $4 million withdrawn from Dora's son's trust fund had gone to the Morans, all of which would have been adequate to explain their apparently ample means
 
 
 [3]
 According to San Filippo's testimony at his trial, in the middle of December, 1976, he asked Dora Moran why, given that Anna Thompson Dodge had died six years earlier, Dora had not yet received the money to which she was entitled under the purported trust agreement. Dora explained that no moneys could be released until probate of the estate was completed. To confirm that story, she placed a phone call to an unidentified party, and handed the phone over to San Filippo, saying "Here is one of the attorneys that is handling the estate. You talk to him and find out when this money will be released." The person on the phone identified himself to San Filippo as an attorney, and told San Filippo that probate of the Dodge estate would be completed by November 1977. San Filippo testified that the person, at San Filippo's request, sent a copy of the court order extending probate until that time to Dora Moran, who showed it to San Filippo. San Filippo stated at trial that he made no notes of the conversation, and he did not get the attorney's name
 
 
 [4]
 San Filippo subsequently argued that as Van Schaack was put on notice by his January 20 conversation with Van Zile that the trust agreement did not exist, he could not have relied on San Filippo's contrary prior representations in authorizing the February 4 loan of $20,000. Even if, as plaintiff argues, the absence of reliance means there was no probable cause for prosecuting San Filippo for fraud as to this second loan--a matter on which we express no opinion--it is irrelevant to the existence of probable cause with regard to the first loan of $55,000, which was authorized a week prior to Van Schaack's conversation with Van Zile
 
 
 [5]
 San Filippo made two changes in the letter, both of which the prosecution argued revealed guilty knowledge of the falsity of his representations in the January 12th letter to Foundos. In place of the January 12th statement that "I know from my own observations and as a result of my professional relationship with her that Mrs. Moran has been receiving that income from that trust ..., he wrote on April 19th that "I have been advised that Mrs. Moran has been receiving substantial income presumably from this fund ..." In place of the January 12th statement that: "In a telephone conversation had with an attorney for the executor of the Anna Thompson Dodge will, I was advised ...", he wrote on April 19th: "In a telephone discussion with an attorney, who identified himself as the attorney for the executor of the Anna Thompson Dodge will..."
 
 
 [6]
 However, we note that where, as here, a Sec. 1983 claim is essentially for deprivation of civil rights through malicious prosecution, federal courts will generally look to the common law requirements to support a claim of malicious prosecution in judging the merits of the Sec. 1983 claim. See Singleton v. City of New York, 632 F.2d 185, 195 (2d Cir.1980); Voytko v. Ramada Inn of Atlantic City, 445 F.Supp. 315, 322-23 (D.N.J.1978). In most states, absence of probable cause for the original charge is an essential element for a valid claim of malicious prosecution. See, e.g., Broughton v. State, 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 94, 335 N.E.2d 310, cert. denied sub nom. Schanbarger v. Kellogg, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975) (New York law); Voytko v. Ramada Inn of Atlantic City, supra, 445 F.Supp. at 322 (New Jersey law); see generally Restatement (Second) of Torts Sec. 674 (1977)
 In the instant case, we believe the substantial evidence implicating San Filippo in the Morans' fraudulent scheme establishes beyond doubt that there was probable cause for his prosecution. In addition to San Filippo's letter of January 12, 1977, to George Foundos purporting to know from personal observation that Dora Moran had been receiving income from the trust, we note that throughout the four years that San Filippo vouched for the existence of the trust, he never once sought to verify it with the attorneys for Anna Thompson Dodge, or with the bank and attorneys listed on the trust instrument--this, despite the long delay in probate, the fact that the purported value of the trust inexplicably grew from $5 million to $9 million over the four years, and the fact that Dora Moran enlisted his aid in an elaborate effort to prevent any prospective lenders from checking on the existence of the trust themselves.