# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2755

AHMAD FARID KHORRAMI,

*Plaintiff-Appellee*,

*v.*

MICHAEL E. ROLINCE, *et al.*,

*Defendants-Appellants*.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 6579—**James B. Zagel**, *Judge*.

———————

ARGUED MAY 6, 2008—DECIDED AUGUST 27, 2008

———————

Before EASTERBROOK, *Chief Judge*, and WOOD and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* The underlying allegations in this appeal paint a sorry picture of false accusations, roughshod law enforcement tactics, and prejudice. Yet at the same time, they remind us of how difficult it has been for law enforcement authorities to learn how to carry out their counterterrorism responsibilities in the post-9/11 world. We conclude, however, that this appeal from

the district court's order denying qualified immunity to certain officials and refusing to dismiss the case is not properly before us. We therefore dismiss the appeal for want of appellate jurisdiction.

## I

Ahmed Khorrami was born in Iran and moved to the United States in 1973 for an education at Purdue University. He went on to receive advanced degrees in aeronautics from the California Institute of Technology, Berkeley, and Oxford. He returned to the United States in 1997 with joint Iranian-British citizenship in order to become a pilot. He completed his training in 2000, and in August of that year he applied for an adjustment of his immigration status based on his marriage to a U.S. citizen. In February 2001, the INS issued Khorrami advance parole authorization, and he began working for Skyway Airlines in Milwaukee in July.

Dr. Khorrami's story is not terribly unusual up to this point, but it changed dramatically after September 11, 2001. (Our account of the facts is based on Khorrami's complaint, which must be taken as true at this stage of the litigation. *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007).)

Within days after the attacks, Khorrami's friends told him that they had been contacted by the FBI. His wife—who had been part of a relief team comforting grieving families at Newark Airport—flew back to Chicago on September 16 because she was worried about him. On September 17, Khorrami agreed to be questioned

in his home by two FBI agents. He told the agents that he would speak to his employer later that day.

Khorrami and his wife visited Skyway Airline's offices and met Khorrami's supervisor, Captain George Velguth, as well as another FBI agent. Khorrami informed this agent of the morning's interview and provided contact information for the FBI to use. The agent then informed Velguth that Khorrami had been cleared by the Chicago FBI and was free to leave.

Suddenly, the situation deteriorated. An FAA security agent burst into the office and ripped Khorrami's airport security I.D. from around his neck. Other government agents appeared, now from the INS as well as the FBI.

This time, Khorrami was interrogated for twelve hours, and the proceedings were not polite. An INS agent directly accused Khorrami of taking part in the terrorist attacks, saying "I know you're one of them." The INS agent also accused him of entering into a phony marriage and threatened to cancel his visa. When Khorrami asked why, the agent's reply was "Because I feel like it, I can and will do it," then added "You're a Muslim and you're fair game." When reminded that the President himself had told Americans not to jump to conclusions and discriminate against Muslims, the agent replied "Didn't you see him wink when he said that?"

After midnight (by this time September 18), Khorrami was taken to Milwaukee FBI headquarters for further questioning. Khorrami's advance parole was canceled and he was given a Notice to Appear. He was then hauled off to the Waukesha County Jail around four or five o'clock in the morning.

Mrs. Khorrami stayed in contact with FBI and INS agents throughout her husband's detention. On the night of September 18, she was told that the Chicago FBI had asked that Dr. Khorrami be removed from the suspect list. She also received a call from the FBI in Washington confirming that his name would be removed from that list and assuring her that the FBI would rescind the letter canceling Dr. Khorrami's advance parole.

The very next day, the INS agent who had canceled Dr. Khorrami's advance parole returned to interrogate him some more. He admitted that he had canceled the parole in order to assist the FBI, which wanted to detain Khorrami but did not have sufficient evidence to continue to do so.

Still detained, Dr. Khorrami was questioned yet again on September 21 by two FBI agents. They hooked him up to a lie detector, and one of the agents signed off as a witness. The "witness" then left the room at the request of the agent conducting the interrogation. Khorrami was told to sign a blank confession, and the agent threatened to send him back to Iran, put him in a dungeon, and prevent him from ever seeing his wife again. When the results were unsatisfactory to the questioner, he knocked Dr. Khorrami to the floor, then kicked him repeatedly. After the interrogation, a prison guard called the prison doctor, who treated Khorrami for bloody urine. Khorrami was also later treated for suicidal tendencies, and had chest pains.

At the same time as Dr. Khorrami was suffering through this interrogation, Mrs. Khorrami was told that her hus-

band's name should not have been on any "watch lists." The next morning, September 22, she was informed that the FBI in Washington had cleared Dr. Khorrami's name from all watch lists. Their theory had been that the flight school where Khorrami taught was connected to some of the hijackers, but the connection was refuted on September 21 and this information was publicized in newspapers the next day.

Dr. Khorrami was moved to DuPage County Jail on September 24. Throughout the months of September and October, an immigration judge ("IJ") denied his attempts to post bail, relying on the INS's assertion that an IJ has no authority to reconsider an INS bail determination.

It was not until November 14 that the INS, at a hearing before the IJ, produced an affidavit from Michael Rolince, Section Chief of the FBI's International Terrorism Operations Section, describing why the FBI was investigating Dr. Khorrami in connection with the terrorist attacks ("the Affidavit"). Among other reasons given, the Affidavit repeated the connection to the flight school in Florida and also asserted that Khorrami had resided in an apartment building in which one of the September 11 hijackers also resided. The Affidavit indicated that the FBI also found suspicious Khorrami's "underemployment," as well as the $100,000 in savings he had amassed (with the help of an inheritance from his parents, who passed away before 1997).

At this point, the situation unraveled fairly quickly. On November 26, an FBI agent—one of the two with whom Khorrami had spoken voluntarily on September 17—

confirmed to Mrs. Khorrami that the link to the flight school had been shown to be of no importance shortly after the attacks, contrary to the assertions in Rolince's Affidavit. On December 11, the Chicago FBI office wrote to the INS stating that the FBI had discovered that there was also an error in the alleged connection to the apartment building as of September 18, again contradicting one of the key assertions in the Rolince Affidavit. The letter was submitted to the IJ on December 12, and Khorrami was released on December 14. On February 17, 2002, Khorrami suffered a nonfatal heart attack. He had had a clean bill of health before his detention, having passed an FAA physical examination for fitness to fly.

Finally, on June 24, 2004, the IJ found Khorrami to be removable, but granted him the adjustment of status he had requested in 2000, making him a permanent resident based on his marriage to a U.S. citizen. Meanwhile, on September 17, 2003, he filed this lawsuit, alleging that he had been detained based on a false affidavit filed by a public official, and that this violated his due process rights under the Fifth Amendment. He asserted a right to sue under *Bivens v. Six Unknown Named Agents of the FBI*, 403 U.S. 388 (1971). The Government moved to dismiss on grounds of qualified immunity and failure to state a claim. The district court granted the motion under FED. R. CIV. P. 12(b)(6) with respect to all parts of the case except for those relying on the Fifth Amendment; it explicitly declined to rule on the qualified immunity motion. The Government has now brought an interlocutory appeal seeking a ruling that qualified immunity

existed and that the remainder of the case in any event should have been dismissed.

## II

The primary weakness of the Government's appeal is that the order that might have supported appellate jurisdiction over this appeal does not exist. The Government's brief premises appellate jurisdiction on *Behrens v. Pelletier*, 516 U.S. 299 (1996). *Behrens* establishes that "an order rejecting the defense of qualified immunity at either the dismissal stage or the summary judgment stage is a 'final' judgment subject to immediate appeal." 516 U.S. at 307. The district court, however, did not reject the qualified immunity defense. Instead, it explicitly set the claim aside to be adjudicated later, stating that "these attacks on Plaintiff's complaint are premature."

Unless the district court delays so long in ruling that the delay becomes a *de facto* denial, a decision not to rule on a motion is just that: inaction. This follows from the general rule the Supreme Court has acknowledged forbidding interlocutory appeals in situations where "unresolved issues of fact" remain or the district court has not even "tentatively decide[d] anything about the merits of the claim." *Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.*, 385 U.S. 23, 25 (1966). See also *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981); *Gardner v. Westinghouse Broadcasting Co.*, 437 U.S. 478, 482 (1978). In all of these cases, the Court has kept a tight rein on different statutes that permit interlocutory appeals. As the

Court noted in *Gardner,* "[t]he exception [to finality created by 28 U.S.C. § 1292(a)(1)] does not embrace orders that have no direct or irreparable impact on the merits of the controversy. The order in this case, like the order in *Switzerland Cheese*, had no such impact; it 'in no way touch[ed] on the merits of the claim but only relate[d] to pretrial procedures . . . .' *Id.* at 25 [quoting from *Switzerland Cheese*]." *Gardner,* 437 U.S. 482.

This court has applied those principles to other settings. For example, in *IDS Life Ins. Co. v. SunAmerica, Inc.,* 103 F.3d 524 (7th Cir. 1996), the defendants wanted to take an appeal even though the district court had not yet ruled on a motion to stay proceedings pending arbitration. We held that deferral cannot be treated as the equivalent of an appealable denial unless the party wishing to appeal can show "unjustifiable delay coupled with irreparable injury if an immediate appeal is not allowed." *Id.* at 526; see also *Continental Cas. Co. v. Staffing Concepts, Inc.,* No. 07-2475, 2008 WL 3013408 (7th Cir. Aug. 6, 2008). In our view, the same rule also applies here. Any doubt on the matter is resolved by a look at *Johnson v. Jones,* 515 U.S. 304 (1995). There the Court found no appellate jurisdiction over an attempted appeal from a denial of qualified immunity. The problem was that the appeal turned not on questions of law, but instead on "the existence, or nonexistence, of a triable issue of fact." *Id.* at 316. More generally, *Johnson* stands for the proposition that an interlocutory appeal is inappropriate where substantial steps remain to be taken in the district court before the facts, and hence the applicable law, are brought into focus. As *Johnson* holds, when the existence of qualified

immunity turns on facts particular to a given case, the district court has tools available that will allow it to preserve the defendant's right to a speedy determination whether he or she must bear the burdens of litigation while at the same time allowing plaintiffs with colorable claims to proceed with their complaints. If the district court has not yet issued an order ruling on the qualified immunity assertion, it is difficult, if not impossible, for an appellate court to intervene. Appellate courts do not sit to prescribe motions calendars for district courts.

The Government concedes that these are the governing principles, but it argues that this is one of those rare cases in which delay is effectively a denial. Such a conclusion, however, fails to take into account what really happened. We cannot see how the delay here was unjustified given the district court's finding that it was premature to rule on the qualified immunity defense. The Government claimed that Rolince was entitled to qualified immunity because, it said, it was "implausible" that he knew of the falsity of the facts asserted in his Affidavit. That kind of defense depends entirely on facts that have not yet been explored: Who reviewed the Affidavit before it went to the IJ? Were there communication problems among the Milwaukee, Chicago, and Washington offices of the FBI? Was the discovery that the associations with the flight school and apartment building had no meaning communicated to the field offices? These are not issues that a district court is able to decide as a matter of law at this early stage of the litigation. "Appeal rights cannot depend on the facts of a particular case." *Carroll v. United States*, 354 U.S. 394, 405 (1957). The district court was

well within its rights to set aside the immunity question for later.

Moreover, no irreparable harm was caused by the court's scheduling decision. The Government contends that qualified immunity is the right to be free from all burdens of litigation, period. That statement goes too far. See *Johnson,* 515 U.S. at 317-18. Qualified immunity is the right to be free at the earliest point at which the court can be sure that the government official's conduct did not violate clearly established statutory or constitutional rights that any reasonable person would have known applied to the situation at hand. If a person was entitled to immunity, then a degree of irreparable injury occurs if the case is mistakenly allowed to go to trial. See *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost *if a case is erroneously permitted to go to trial.*") (first emphasis in original, second added). Even in that situation, if the court belatedly realizes that immunity should have been granted, it can still spare the defendant from the burden of damages. (This assumes that the standards for granting qualified immunity differ in significant respects from those governing liability on the merits. It is possible that the Supreme Court may throw further light on that subject in *Pearson v. Callahan,* No. 07-751, *cert. granted,* Mar. 24, 2008, which will consider whether *Saucier v. Katz,* 533 U.S. 194 (2001), should be overruled. Because our case concerns appellate jurisdiction, we see no need to hold it for *Pearson.*)

In the event of a brief pretrial postponement of a qualified immunity argument at the same time as the court is considering a motion under Rule 12(b)(6), the district court is the only judicial tribunal that may revisit the issue. While this will embroil the defendant official for a brief time in the litigation, there is no way to avoid these burdens altogether and at the same time conduct the litigation in a way that is fair and orderly to both parties. The fact that the Supreme Court has recognized that more than one appeal from an order denying qualified immunity is permissible, see *Behrens*, 516 U.S. at 306-07, shows that the Court recognizes that a certain amount of pretrial activity, including the discovery necessary to prepare a motion for summary judgment (or defend against one), is inevitable.

All of what we have just said may have been true before the Supreme Court decided *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), the Government concedes, but, in its view, *Twombly* changed everything. A complaint must now include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. In an interlocutory appeal from a denial of qualified immunity, the first question is "whether or not certain given facts showed a violation of 'clearly established law.'" *Johnson*, 515 U.S. at 311; see also *Mitchell*, 472 U.S. at 528 n.9 ("We emphasize at this point that the appealable issue is a purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law."). Whether or not the district court had anything to say about it, the Government asserts that we can look at the complaint for ourselves and decide whether Khorrami can make such a showing.

This is not an appropriate way to proceed. Taken as a general proposition, it would invite interlocutory appeals on qualified immunity issues before anyone even presented the argument to the district court. The fact that appellate review from decisions to dismiss cases under FED. R. CIV. P. 12(b)(6) is *de novo* does not mean that litigants are entitled to bypass the district court altogether. Even if this were permissible, moreover, nothing in *Twombly* suggests that Khorrami's complaint is inadequate for this purpose. Khorrami's allegations about Rolince's knowledge are plausible, and only discovery will show whether they are correct. Whether Rolince in fact was aware, unaware, or reckless has yet to be shown, but those facts need not be pleaded in the complaint. See *Erickson v. Pardus*, 127 S.Ct. at 2200. The Government suggests that perhaps a higher pleading standard is appropriate in a qualified immunity case, but the Supreme Court has squarely rejected that proposition. See *Crawford-El v. Britton*, 523 U.S. 574, 594-96 (1998).

Nothing in the Second Circuit's decision in *Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008), requires a different outcome. In *Benzman*, the former Administrator of the Environmental Protection Agency, Christine Todd Whitman, appealed from the district court's decision denying her motion to dismiss on grounds of qualified immunity. As it was required to do under *Saucier*, the court first considered whether, taking the facts as the plaintiffs had pleaded them, a *Bivens* claim was available at all and whether the facts described the violation of a constitutional right. It was in this context that the court commented that "a bare allegation that the head of a Govern-

ment agency, guided by a relevant White House office, knew that her statements were false and 'knowingly' issued false press releases is not plausible in the absence of some supporting facts." *Id.* at 129. It concluded that "arguably inadequate management of a vast agency of 17,000 employees is not a basis for *constitutional* tort liability." *Id.* (emphasis in original). We understand this only as a holding that the facts pleaded, taken as true, could not support a finding of a constitutional violation. (It is also worth noting that the Second Circuit did not address the relation between this holding and appellate jurisdiction: it had nothing to say about appellate jurisdiction at all.)

In our case, the complaint accuses Rolince of perjury. The Government does not deny that, if true, the facts Khorrami alleged—that Rolince perjured himself—would demonstrate a violation of clearly established law. See *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding that a conviction based on testimony known to be false violated the Constitution). Only in its supplementary brief does it assert that a reasonable FBI agent might think the false connections between the flight school and the apartment were harmless if the rest of the facts would be sufficient to justify the agency's concerns. This reasoning makes no sense to us, unless we are being asked to assume that FBI agents think nothing of swearing out false affidavits on penalty of perjury, see 18 U.S.C. §§ 1621, 1623, which is certainly not an assumption we are willing to make. If Khorrami is correct, Rolince may have violated his rights and independently broken the law.

Before concluding, we note that Rolince has not raised a claim of absolute (rather than qualified) immunity, and so nothing we say should be understood as a ruling on that theory. In *Briscoe v. LaHue,* 460 U.S. 325 (1983), the Supreme Court held that witnesses who allegedly gave perjured testimony at a criminal trial were absolutely immune from later suit under 42 U.S.C. § 1983. *Id.* at 333. This court recognized that the absolute immunity extends to a police officer's participation in pretrial proceedings, in *Curtis v. Bembenek,* 48 F.3d 281, 284 (7th Cir. 1995); see also *Giffin v. Summerlin,* 78 F.3d 1227, 1230-31 (7th Cir. 1995) (relying on Indiana law, and holding that it would apply the *Briscoe* rule to affidavits as well). Whether this model fits Rolince's actions is yet to be determined. The relevant questions would include whether Rolince made the statements Khorrami is attacking during the pre-judicial phase of these proceedings, see *Malley v. Briggs,* 475 U.S. 335 (1986); whether Rolince should be characterized as a "witness"; and whether an immigration court is the kind of tribunal the rule contemplates.

In the end, the Government is trying to conflate its argument over pleading standards with the argument over qualified immunity. Orders denying qualified immunity (when they exist) and rulings denying Rule 12(b)(6) motions are subject to different rules for appellate jurisdiction. In the end, we have before us only an attempted appeal from a presumed denial of qualified immunity. We repeat that the lack of a ruling from the district court under these circumstances is not the functional equivalent of a denial of the motion. We also find it procedurally unac-

ceptable to rule on the sufficiency of the complaint through the back door, using the Government's theory that a complaint that fails to allege a constitutional violation clearly enough to satisfy *Twombly* is all that it needs in order to appeal. Khorrami's story is plausible enough that we can conclude that he properly alleged a violation of clearly established law by someone acting under color of law. That showing, in turn, is sufficient to satisfy us that no interlocutory appeal is authorized here: there was no order denying qualified immunity, no constructive denial resulted, and the issue was not sufficiently concluded to allow for another form of interlocutory appeal. The appeal is therefore DISMISSED for want of appellate jurisdiction.